**LISCO STATE BANK, Plaintiff,**

v.

**McCOMBS RANCHES, INC., Defendant.**

**No. CV89–0–491.**

United States District Court,
D. Nebraska.

Oct. 3, 1990.

David Pederson, Murphy, Pederson, Piccolo & Pederson, North Platte, Neb., for plaintiff.

Gregory Michael Ruhnke, McCamish, Martin, Brown & Loeffler, Jonathon D. Pauerstein, San Antonio, Tex., and McCarthy & Gale, Glenn Van Velson, North Platte, Neb., for defendant.

## MEMORANDUM AND ORDER ON MOTION FOR SUMMARY JUDGMENT

URBOM, District Judge.

By his report and recommendation dated September 19, 1990, Magistrate David L. Piester recommended that the defendant's motion for summary judgment be granted. The plaintiff has objected. I conclude that the magistrate's recommendation should be adopted.

The tenor of the plaintiff's brief in support of its objection is that the Food Security Act of 1985, on which the magistrate's recommendation is founded, is not applicable to this case because there is no danger in this case of "double jeopardy"—that is, of the buyer's having to pay twice for the same cattle.

The plaintiff argument is not persuasive. The plaintiff has no ownership interest in the cattle at issue, except by way of a claimed lien. The Food Security Act of 1985 by § 1631(d) deals directly with the matter of a buyer's taking free of security interests created by the seller. The conditions of that section have been met and the defendant takes free of the plaintiff's claim lien.

IT IS ORDERED that the motion of McCombs Ranches, Inc. for summary judgment, filing 16, is granted.

## REPORT, RECOMMENDATION AND ORDER

September 19, 1990

DAVID L. PIESTER, United States Magistrate.

Pending before the court is a motion for summary judgment filed by the defendant, McCombs Ranch, Inc.

The purpose of a motion for summary judgment is to determine whether a "genuine issue of material fact" exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). All inferences of fact must be drawn against the moving party, who carries the burden of showing that no issue of material fact exists and that it is entitled to judgment as a matter of law. *See, e.g., AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). Rule 56(c) mandates that summary judgment be granted when the non-moving party fails to make a sufficient showing on an element on which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986):

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving par-

ty is "entitled to judgment as a matter of law" because the non-moving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.

*Id.*

This is a conversion action filed by Lisco State Bank in which it seeks to recover from the defendant the balance of its security interest in cattle previously owned by a debtor of the bank, Z.T. Bar, Ltd. The defendant, McCombs Ranch, a Texas corporation, purchased thirty-three head of cattle from two affiliated cattle companies in the State of Nebraska, Z.T. Bar, Ltd. and Cunningham Cattle, Inc. Thirty heifers were involved in the Z.T. Bar transaction, and the Cunningham Cattle transaction involved three head: a bull, nurse cow, and calf. The parties have agreed that the following facts are uncontroverted:

Lisco State Bank was an operating lender for Z.T. Bar, a partnership with a registered Gelbvieh cattle operation with its place of business in western Nebraska. As of April 24, 1987 Z.T. Bar was indebted to the plaintiff in an amount in excess of $250,000. The plaintiff's loans to Z.T. Bar were secured with security agreements and financing statements in which Z.T. Bar granted the plaintiff bank a security interest in all cattle owned or thereafter acquired by Z.T. Bar.

On April 24, 1987 the defendant entered into an agreement with Jerry Cunningham[1] for the purchase of thirty heifers, a bull, nurse cow, and calf for a total price of $100,000. The defendant issued a check for $45,000 payable to Z.T. Bar and Lisco State Bank for the thirty heifers, and a check for $55,000 for the three cattle purchased from Cunningham. The defendant took possession of the cattle at Broadwater, Nebraska. Alan Sparger, an agent for the defendant McCombs Ranch, signed four bills of sale for the cattle from Z.T. Bar and Cunningham Cattle.

Subsequent to the issuance of the first $45,000 check, the defendant learned that Dr. Charles Vincent was asserting a claim against Z.T. Bar's cattle. This check was not cashed, and after assurances from the Lisco State Bank and Z.T. Bar that Vincent's claim was invalid, the defendant issued a replacement check for $45,000, numbered 00880, again payable jointly to the plaintiff and Z.T. Bar. The defendant typed the following language on the second check: "Endorsement and cancellation of this check constitutes full release of all liens on the cattle bought from Cunningham Cattle Co., invoice no. 238 dated April 24, 1987." The plaintiff subsequently endorsed and cashed check number 00880.

In this action the plaintiff alleges that the $45,000 purchase price for the thirty heifers bought from Z.T. Bar was not the "true value" of those cattle, and seeks to recover from the defendant the remaining value in which it claims a security interest. The uncontroverted facts establish that the total sum of $100,000 was a fair market price for the thirty-three cattle purchased by McCombs. It is also undisputed that Jerry Cunningham informed Tom Olson, President of Lisco State Bank, after the sale that Z.T. Bar had sold the thirty heifers for $45,000. In addition, the parties agree that at the time of the sale the defendant was informed that the plaintiff had a lien against the Z.T. Bar cattle. However, the plaintiff now alleges that the defendant paid far below the fair market price for the Z.T. Bar cattle, asserting that the thirty heifers were actually worth "not less than $92,000.00." Plaintiff now seeks to recover the difference between that purchase price and the alleged fair market value of the thirty heifers.

In the motion for summary judgment the defendant asserts two grounds for summa-

---

1. Although not specifically stated in the uncontroverted facts of the Order on Pretrial conference, Jerry Cunningham is apparently the owner of Cunningham Cattle, Inc., and according to the complaint filed herein, "Cunningham Cattle, Inc., is a Nevada corporation owned by the same family which owns Z.T. Bar." I mention these alleged facts only to clarify Mr. Cunningham's involvement in this case, and not as conclusive findings for purposes of this case. I further note that the parties do not appear to be challenging, in this action, Mr. Cunningham's authority as an agent to sell the thirty heifers for Z.T. Bar.

ry disposition of this matter. First, the defendant asserts that the Food Security Act, codified at 7 U.S.C. § 1631, bars the present action in that the plaintiff failed to meet the notice requirements of that statute, and, therefore, the defendant took the cattle free from any security interest held by the plaintiff. Second, the defendant asserts that the plaintiff's action is barred by the doctrine of accord and satisfaction, since it endorsed and cashed the second $45,000 check with the restrictive endorsement typed thereon.

## FOOD SECURITY ACT

■ The Food Security Act of 1985 (hereafter the "FSA") includes within its voluminous provisions a section which statutorily abrogates the widely enacted "farm products" exception of § 9–307(1) of the Uniform Commercial Code. Section 1324 of the Act, entitled "Protection For Purchasers of Farm Products," codified at 7 U.S.C. § 1631, was a congressional attempt to eliminate potential exposure of "purchasers of farm products to double payment liability," 7 U.S.C. § 1631(a)(2), and the concomitant burden on interstate commerce in farm products. § 1631(a)(4).

Section 1631(d) provides:

Except as provided in subsection (e) of this section and notwithstanding any other provision of Federal, State, or local law, a buyer who in the ordinary course of business buys a farm product from a seller engaged in farming operations shall take free of a security interest created by the seller, even though the security interest is perfected; and the buyer knows of the existence of such interest.

Subsection (e) then sets forth the circumstances under which a buyer takes the product subject to the security interest. Under the FSA survival of the security interest is conditioned upon either direct notice to the buyer or filing of an "effective financing statement" as part of a *federally approved* state "central filing system," § 1631(c)(2).

As noted above, the defendant asserts that the plaintiff's action is barred for its failure to comply with the provisions of

§ 1631(e). The plaintiff claims, however, that the defendant was given actual notice of Lisco's lien at the time of the sale since the defendant's own agent inquired as to any encumbrances on the cattle and was informed that the bank had a security interest in the thirty heifers. The plaintiff argues that the $45,000 check issued to both Z.T. Bar and Lisco State Bank is circumstantial evidence which indicates knowledge by the defendant of the lien.

The defendant does not contest the plaintiff's assertion that McCombs had actual knowledge of Lisco's lien on the Z.T. Bar cattle. The uncontroverted facts from the Order on Pretrial Conference explicitly provide, "[t]he defendant through its agents and employees was informed at the time of the sale that Lisco had a lien in the Z.T. Bar cattle." (Filing #41, p. 4 at ¶ 10). Notwithstanding that notice, the defendant argues that the plaintiff wholly failed to comply with the specific notice provisions of the FSA, thus giving the defendant clear title to the cattle.

In response, the plaintiff argues that even if it did not comply with the FSA, the defendant was required by the FSA and the Nebraska enabling legislation passed in response to the FSA to act in "good faith," a requirement which was not met by the defendant, because it purchased the thirty heifers knowing that the price was far below the fair market value, and thus knowing that the bank was not receiving full value for its collateral.

Despite arguments by the plaintiff to the contrary, I conclude from my analysis of the FSA that the defendant herein took the thirty cattle at issue free of the security interest held by the plaintiff because the plaintiff failed to meet the notice requirements of 7 U.S.C. § 1631(e).

### Good Faith Requirement?

■ For reasons which are not altogether clear, Congress chose not to include in the FSA a "good faith" requirement on the part of buyers such as that found in the Uniform Commercial Code. *See*, Neb.U.C.C. § 1–201(9). The U.C.C. defines "Buyer in the ordinary course of business" as follows:

"a person who in *good faith* and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in the ordinary course from a person in the business of selling goods of that kind. . . .

Neb.U.C.C. § 1–201(9). The FSA, however, did not adopt the U.C.C. definition; rather it defined that phrase as follows:

The term "buyer in the ordinary course of business" means a person who, in the ordinary course of business, buys farm products from a person engaged in farming operations who is in the business of selling farm products.

7 U.S.C. § 1631(c)(1).

In the early draft of the Food Security Act, which was considered by the House Committee on Agriculture (H.R. 2100), what was at that time § 1314(c) defined "buyer in the ordinary course of business" as follows:

[T]he term "buyer in the ordinary course of business" means a person who (A) in the ordinary course of business, buys farm products from a person engaged in farming operations who is in the business of selling farm products, and (B) buys the product in good faith and without knowledge that the sale is in violation of the ownership rights or security interest of a third party in the products. . . .

H.R.Rep. No. 99–271(I), 99th Cong., 1st Sess., *reprinted in* 1985 U.S.Code Cong. & Admin.News 1103, 1398 (Vol. 2). As is obvious from the codified version of the FSA, the original House version of that definition was not enacted into law. Instead, the Senate amendment which omitted the "good faith and without knowledge" language was ultimately adopted by the House Conference. H.C.Rep. No. 99–447, 99th Cong., 1st Sess., *reprinted in* 1985 U.S.Code Cong. & Admin.News 2251, 2412–13 (Vol. 3).

■ It is apparent that the definition of "buyer in the ordinary course of business"

was a considered choice of the congressional drafters of the Act, and it is not the function of this court to question that wisdom. Arguably the difference in definition from the U.C.C. was intentional. The use of the U.C.C. definition would seemingly have been in direct conflict with § 1631(d) allowing a buyer to take free of a security interest even if the "buyer knows of the existence of such interest." It is apparent that Congress intended by the FSA to shift the potential burden of loss in cases of the sale of farm products to the lenders who finance farm operations, rather than have that burden imposed upon buyers, thus inhibiting interstate commerce. If Congress has cast its net too broadly in the FSA, at least in some circumstances, the proper remedy is in legislative amendment, not strained construction by the judiciary.

In the alternative, the plaintiff also argues that the Nebraska enabling legislation, Neb.Rev.Stat. § 52–1301 et seq. (Reissue 1988), enacted in response to the Food Security Act, includes a good faith requirement which was breached by the defendants. It is true that the "good faith" requirement is included in one section of the Nebraska statute; such a requirement is found at § 52–1319 which defines "Receipt of written notice" as follows:

For purposes of section 1324 of the Food Security Act of 1985, Public Law 99–198, receipt of written notice shall mean the date the notice is actually received by a buyer in the ordinary course of business or the first date upon which delivery is attempted by a carrier. A buyer in the ordinary course of business shall act in good faith. In all cases a buyer in the ordinary course of business shall be presumed to have received the notice ten days after it was mailed.[2]

■ Nebraska's choice to require good faith on the part of buyers as to the question of receipt of notice does not alter the fact that the FSA is devoid of such a requirement as it relates to the actual pur-

---

**2.** Congress chose to leave to the states the task of defining "receipt." The FSA states at 7 U.S.C. § 1631(f), "[w]hat constitutes receipt, as used in

this section, shall be determined by the law of the State in which the buyer resides."

chase transaction itself. Nebraska's statutory scheme is merely the enabling legislation necessary to create the "central filing system" suggested by the FSA; it is not the controlling rule of law which governs actions of this kind. The gravamen of the plaintiff's action is that the purchase transaction as a whole was entered into by the defendant in bad faith, rather than a question of when notice was received. The question herein is the adequacy and effect of the notice to this defendant, not when that notice was received. Resolution of the latter question would be controlled by the law of the state of Nebraska, while the issues raised in this case are governed by the provisions of the FSA.[3]

### Compliance with the FSA

█ The core difficulty with the case presented herein is that the security interest at issue was created prior to the enactment of the FSA. The FSA contemplates that a lender will, at the time of the creation of the debt and security interest, do one of two things. The lender may require in writing in the loan agreement that the borrower give a list of potential buyers of its product, or include an agreement that the borrower will notify the lender in writing of the identity of the buyer seven days in advance of a sale. See, 7 U.S.C. § 1631(h). These provisions make "direct notice" to the buyer possible as contemplated by § 1631(e)(1)(A). In the alternative, at the time of the creation of the security agreement, the lender can require that the borrower sign an "effective financing statement" which will then be filed with a state's central filing system, if such a system exists.

In this case, however, either of the alternatives noted above had to be effectuated *after* the creation of the security interest.

Therein lies the peculiar circumstances of this case. The plaintiff argues that it could not give direct notice to the buyer/defendant because it was not given sufficient time prior to the sale to do so. Further, the plaintiff argues that it could not file an "effective financing statement" with the Nebraska Secretary of State as of December 24, 1986 because the debtor/seller refused to sign such a document. The defendant simply argues that, no matter what the reason, the plaintiff failed to comply with the provisions of the FSA, and therefore, it cannot enforce the security interest against the buyer of the Z.T. Bar cattle.

Although there is a noticeable absence of reported cases discussing the law relating to the FSA, the result reached in this matter is supported by one other case from this court. In *FDIC v. Bowles Livestock Com'n. Co.,* 739 F.Supp. 1364 (D.Neb. 1990), the FDIC was attempting to collect the proceeds of a series of sales of the collateral (hogs) securing the notes. The defendant seller in that case was a livestock market agency through which the debtor was selling the collateral. The defendant was notified in writing by the FDIC of its security interest in the collateral on July 7, 1986. The defendant had given the net proceeds from those sales directly to either the debtor or a middle man with whom the debtor dealt as a cosigner for the sale of his hogs. For purposes of the case herein, the court in *Bowles* held that as to those hogs sold by the defendant market agent, the FDIC was barred from collecting the proceeds of any sales occurring after December 23, 1986, the date of enactment of Nebraska's central filing system for purposes of FSA compliance, since the FDIC "failed to establish that an effective finance statement within

---

**3.** To the extent that the Nebraska law could be said to conflict with the FSA, although I conclude it does not, it should be noted that the Nebraska statute included the following provision:

> The State of Nebraska hereby adopts the federal rules and regulations in effect on November 21, 1986, adopted and promulgated to implement section 1324 of the Food security Act of 1985, Public Law 99–198. If there is a

conflict between such rules and regulations and sections 52–1301 to 52–1321, the federal rules and regulations shall apply.

Those rules and regulations, codified at 9 C.F.R. § 202.1 et. seq. explicitly adopted the definitions found in the section 1324 of the FSA, *see,* 9 C.F.R. § 205.1, which would include the definition of "buyer in the ordinary course of business."

the meaning of 7 U.S.C. § 1631(g)(2) ha[d] been filed." *Id.* at 1376. The court noted:

> While the financing statements were filed with the County Clerk of Johnson County, Nebraska, there is no evidence that financing statements which comply substantially with § 1631(c)(4) were filed with the Secretary of State.

739 F.Supp. at 1376.

The *Bowles* court denied recovery as to collateral sold subsequent to the enactment of Nebraska's central filing system despite the fact that the holder of the security interest, the FDIC, had notified the defendant/market agent in writing of its lien on July 7, 1986. The court did not directly address the question of whether that notice was sufficient to satisfy the "direct notice" requirements of the FSA, 7 U.S.C. § 1631(e)(1)(A). The court's holding at least implicitly indicated that the direct written notice to the defendant was not sufficient to satisfy the "direct notice" provision of the FSA.[4] For purposes of this case, however, I need not resolve any potential uncertainty regarding the continued viability of "direct notification" in Nebraska since the plaintiff, as will be discussed below, failed to meet either requirement of the FSA.

The plaintiff herein was not without a means to protect its security interest. The FSA set forth the exceptions to the "clear title" provision contained in the FSA. Section 1631(e)(1)(A) provides that a buyer of farm products takes subject to a security interest if the buyer is given direct "written" notice of the security interest. In the alternative, in accordance with § 1631(e)(2), in the case of a state that has established a "central filing system," the buyer takes subject to the security interest if (1) he or she "fail[s] to register with the Secretary of State of such State prior to the purchase of farm products" *and* the "secured party has filed an effective financing statement or notice that covers the farm products being sold," or, (2) in accordance with 1631(e)(3), the buyer receives "written notice" from the "Secretary of State of such state," as provided by a "master list" of all "effective financing statements," and "does not secure a waiver or release of the security interest specified...."

Nebraska was one of the first states to enact the enabling legislation for the creation of a central filing system in accordance with § 1631. *See,* Reiley, *supra* at 268. Nebraska's proposed central filing system, established in accordance with Neb.Rev.Stat., §§ 52–1301–1321, "received federal certification on December 16, 1986," and the "first list of master liens was issued January 2, 1987." *Id.* at 269. Thus the plaintiff herein had available the option of filing an "effective financing statement" prior to the time that the defendant purchased the Z.T. Bar cattle, which would have then placed the burden of statutory compliance upon the defendant/buyer. In this case the uncontroverted facts in the "Order on Pretrial Conference" explicitly state that the plaintiff bank "did not file an Effective Financing Statement" with regard to Z.T. Bar's cattle." (Filing # 41, p. 4 at ¶ 12).

---

4. The alternative reading of the court's holding is that the "direct notice" provisions of § 1631(e) are inapplicable in states which enact central filing systems, such as that created in Nebraska. I do not read the FSA as having created such an "either/or" situation. As noted by one commentator on the subject, "[t]he FSA is worded so that direct notification is also available in states that do adopt a central filing system." Reiley, *State Law Responses to the Federal Food Security Act,* 20 U.C.C.L.J. 260, 265 (1988). The author went on to suggest:

> Since direct notification may be done even in states that have a certified central filing system, lenders in all states should consider the ease with which they can preserve that option.

*Id.* at 278. The conclusion that states such as Nebraska intended to retain the "direct notice" alternative can be seen in the language of Nebraska's enabling legislation found at Neb.Rev. Stat. § 52–1301 (Reissue 1988):

> It is also the intent of the Legislature that upon the adoption of the central filing system that security interest holders *be encouraged* to use such system in lieu of any other notice provided by section 1324 for farm products used or produced in the State of Nebraska which are included in the central filing system.

I do not read either the FSA of the Nebraska law as requiring a lender to choose between "direct notification" of the "central filing system."

The plaintiff argues that it was unable to file an "effective financing statement" on the Z.T. Bar cattle because "ZT failed and refused to sign such a statement." (Affidavit of Tom Olson, filing # 39, ¶ 5). According to the affidavit of Lisco Bank's president Tom Olson, the bank, in an effort to comply with the FSA, "sent all of its agricultural borrowers a letter requesting that they come into the bank and sign Effective Financing Statements." *Id.* Z.T. Bar failed to comply with the request or refused to do so, according to Mr. Olson because "the bank and ZT Bar were in adversarial and strained relationship by December 1987."

The FSA seemingly requires that an "effective financing statement," inter alia, be "signed by the debtor." 7 U.S.C. § 1631(c)(4)(C). While not necessarily dispositive of the question, it is at least instructive to examine the federal rules and regulations established to effectuate compliance with the FSA. These regulations include an enumeration of the "minimum requirements" of an "effective financing statement," and these do not include the "signature of the debtor." *See,* 9 C.F.R. § 205.103 (1990).[5]

Assuming for the sake of argument that the debtor's signature is required in the "effective financing statement," the question arises whether both the Nebraska statute and the FSA include a provision within the "effective financing statements" requirements which may allow for the omission of such a technical requirement in unusual cases such as the present. In addition to setting forth the requirements for an effective financing statement, Neb.Rev. Stat. § 52–1307 also includes a provision which states that the [e]ffective financing statement shall mean a statement that:

(9) Substantially complies with the requirements of this section even though it contains minor errors that are not seriously misleading.

This provision was incorporated into the Nebraska statute based upon the requirements set forth in the FSA at § 1631(c). Subparagraph (4) of section (c) of the FSA defines an "effective financing statement," which was adopted verbatim in the Nebraska law, and at subsection (4)(I) defines it as a statement that "substantially complies with the requirements of this subparagraph even though it contains minor errors that are not seriously misleading."

While no court has yet to face the question of what constitutes "substantial compliance" for purposes of an adequate "effective financing statement" filed pursuant to the FSA, it appears that the federal as well as the state law allows for some deviation from the stated requirements if such departure is not "misleading." Presumably the drafters of the FSA borrowed the "substantial compliance" provision from Article 9 of the U.C.C., specifically § 9–402(8) relating to financing statements, which states as follows:

A financing statement substantially complying with the requirements of this section is effective even though it contains *minor errors which are not seriously misleading.*

Neb.U.C.C. § 9–402(8) (Emphasis added). I raise this comparison to illustrate that this "minor error" provision of the U.C.C. was

---

**5.** 9 C.F.R. § 205.103 STATES:

(a) The minimum information necessary on an EFS is as follows:

(1) Crop year *unless* every crop of the farm product in question, for the duration of the EFS. is to be subject to the particular security interest;

(2) Farm Product name (see §§ 205.106, 205.206);

(3) Each county or parish in the same State where the farm product is produced or to be produced;

(4) Name and address of each person subjecting the farm product to the security interest, whether or not a debtor (see § 205.102);

(5) Social security number or, if other than a natural person, IRS taxpayer identification number, of each such person;

(6) Further details of the farm product subject to the security interest *if needed* to distinguish it from other such product owned by the same person or persons but not subject to the particular security interest (see § 205.207); and

(7) Secured party name and address.

(b) A requirement of additional information on an EFS is discretionary with the State. (Emphasis in original).

apparently not intended to apply only to cases of inadvertent errors, but also is intended to apply to cases such a this where a lender is simply not in compliance with a minor or immaterial requirement on a financing statement. As noted by the Comment to U.C.C. 9-402:

> Subsection (8) is in line with the policy of this Article to simplify formal requisites and filing requirements and is designed to discourage fanatical and impossibly refined reading of such statutory requirements in which courts have occasionally indulged themselves.

Neb.U.C.C. § 9-402 (Comment 9).

■ The question then remains, is the omission of a debtor's signature a "minor error" for purposes of the FSA? For purposes of the U.C.C. such an omission has nearly universally been held to be a major error which renders the financing statement ineffective. *See,* White & Summers, *Uniform Commercial Code* 371–72 (3d ed. 1988). Whether this result would be the same for purposes of the FSA's "effective financing statements" has yet to be raised in the courts and an answer is certainly not clear from the Act itself. It is at least arguable that the omission of a debtor's signature on an "effective financing statement" filed pursuant to the FSA could be considered a "minor error" which is not "substantially misleading" based largely upon the difference in purpose between the U.C.C. and the FSA. The FSA is intended principally as a notice statute to protect buyers of farm products from the threat of double payments. The provisions of Article 9 of the U.C.C., while also designed to give notice, are also intended to effectuate creation and perfection of security interests for the protection of and the resolution of priority claims among secured parties. The dangers inherent in allowing secured parties to file financing statements without signatures of the debtors, i.e., "the fear that some nasty creditor will cast a shadow over all of the debtor's property by filing a financing statement" which has not been reviewed by the debtor, White & Summers, *supra* at 372, is not present in the case of "effective financing statements" filed pursuant to the FSA. The drafters of the FSA made clear that the FSA "would not preempt basic state-law rules on the creation, perfection, or priority of security interests." 9 C.F.R. § 205.202 (1990).

Despite the uncertainty of what constitutes "substantial compliance" for purposes of "effective financing statements" filed under the FSA, I conclude that in this case I need not resolve that question. I am unpersuaded by the plaintiff's "defense" to the bar of the FSA which is based solely upon its assertion, even if true, that the debtor, Z.T. Bar, refused to sign an "effective financing statement." In this case, besides a "request" that the debtor sign an "effective financing statement," there was no effort on the part of the plaintiff lender to comply with the requirements of the FSA pursuant to the Nebraska's "central filing system." The plaintiff had in its possession documents, which in combination with an "effective financing statement" could have been submitted to the Secretary of State for filing pursuant to Nebraska's central filing system. The security agreement, filed as part of the record in this case, contains the signature of the debtor, and was filed as a U.C.C. financing statement with the Morrill County, Nebraska clerk's office. Had this document been filed in combination with an "effective financing statement" with the Secretary of State after December 24, 1986, the plaintiff could at least now argue that it acted in a commercially reasonable manner by doing all that it was able to do under the circumstances, thus shifting the burden to the defendant to have registered as a buyer with the Secretary of State on order to take free of any security interests. See, White & Summers, *supra* at §§ 24–5, p. 317–18 and 24–18, p. 373 (Arguing that merging of multiple documents should be permissible under the U.C.C. to effectuate a valid financing statement, *citing, J.K. Merrill & Son v. Carter,* 108 Idaho 749, 702 P.2d 787 (1985); *Sommers v. International Business Machines,* 640 F.2d 686 (5th Cir.1981)).

■ I cannot conclude that Congress intended to exempt lenders from the "clear title" provisions of the FSA merely because

the lender could convincingly argue that a recalcitrant debtor refused to sign the financing statement rendering the lender unable to file in accordance with the law. When it enacted the FSA Congress clearly intended to place the burden of loss upon the lender in the absence of compliance with the notice provisions of the Act. The Act does not contemplate shifting that burden to a buyer merely because its seller, the borrower, refused to sign the necessary financing statement.

I emphasize that my recommendation is limited to the peculiar facts of this case, and is not intended to address situations where a lender made a commercially reasonable attempt to comply with the provisions of the FSA. Here there is no evidence to support a finding that the lender made any attempt to protect its security interest in accordance with the FSA, when the debtor refused to sign an "effective financing statement." Such inaction cannot be a defense to the buyer-oriented provisions of the FSA.

Besides the "central filing" alternative, the plaintiff could also meet the requirements of the FSA by giving the buyer direct notice of its security interest. The plaintiff argues, as noted above, that in essence the defendant was given notice sufficient to constitute "direct notice" when Cunningham informed the agent for McCombs Ranch that Lisco State Bank held a lien against Z.T. Bar's cattle. I cannot agree. The notice given the defendant did not comply with the requirements of the FSA's "direct notice" provision which requires the following:

> A buyer of farm products takes subject to a security interest created by the seller if—
>
> (1)(A) within 1 year before the sale of the farm products, the buyer has received from the secured party or the seller *written* notice of the security interest organized according to farm products that—

(i) is an original or reproduced copy thereof;

(ii) contains

(I) the name and address of the secured party;

(II) the name and address of the person indebted to the secured party;

(III) the social security number of the debtor or, in the case of a debtor doing business other the as an individual, the Internal Revenue Service taxpayer identification number of such debtor;

(IV) a description of the farm products subject to the security interest created by the debtor, including the amount of such products where applicable, crop year, county or parish, and a reasonable description of the property; and

(iii) must be amended in writing, within 3 months, similarly signed and transmitted, to reflect material changes;

(iv) will lapse on either the expiration period of the statement or the transmission of a notice signed by the secured party that the statement has lapsed, whichever occurs first; and

(v) any payment obligations imposed on the buyer by the secured party as conditions for waiver or release of the security interest; and

(B) the buyer has failed to perform the payment obligations.

7 U.S.C. § 1631(e)(1) (Emphasis added).

The plaintiff has failed to show, nor does it argue, that it met or substantially complied with the material terms of § 1631(e)(1). There is no dispute that the defendant did not receive written notice of the lien held by the plaintiff. At most it appears from the evidentiary materials before this court that the extent of the notice to the defendant was the name of the secured party. In short, it cannot be said that the notice received by the defendant herein met with the "direct notice" requirements of § 1631(e)(1).[6]

---

**6.** I note that the "direct notice" provisions of the FSA does not contain the "substantial compliance" language included in the definition of the "effective financing statement." Seemingly compliance with the precise terms of the Act is required.

**340**

Although the result in this case seems harsh given that the defendant/buyer received oral notice of the plaintiff's security interest, it is clearly a result intended by the drafters of the FSA. The intentional deletion of the time-worn "good faith and with knowledge" U.C.C. language from the FSA definition of "buyer in the ordinary course of business" clearly implies that a buyer may take free of a security interest even if he or she is aware that the sale is in violation of a security interest. This result was discussed by White & Summers as follows:

> Because the federal act contains its own definition of buyer in the ordinary course, notice that tells the buyer that a sale to him by a specific farmer is a violation of a security agreement will not be effective to keep the buyer from being a purchaser in the ordinary course under the federal law. Under the Uniform Commercial Code, one who has notice that the sale to him is in "violation of the ownership right or security interest" is not a buyer in the ordinary course. Under federal law, such a person can be a buyer in the ordinary course. Therefore, notices that accurately tell that sales are in violation of a security agreement but which do not formally comply with the federal rule will not protect the creditor.

White & Summers, *supra* at 541 (Footnotes omitted).

The result in this case seems troublesome largely because the security interest held by the plaintiff was one which was in place long before the FSA was enacted. The retroactive application of the FSA to the plaintiff's action may appear inequitable; however, the FSA did not explicitly exempt prior security interests from its scope. In fact, the Act was enacted on December 23, 1985 and did not become effective until 12 months after that date. 7 U.S.C. § 1631(j). As stated in the legislative history of the Act that section was intended only to provide a one year exemption:

> All security interests that attach prior to the effective date of these provisions will be exempt from the provision for 1 year.

H.C.Rep. No. 99–447, *supra* at 2412. When viewed in light of the *enactment* date of the Act, this plaintiff had from December 23, 1985 until April 23, 1987 to ascertain its best course of action to protect its security interest in the collateral securing the Z.T. Bar loan. The facts presented in this case fail to establish either "substantial compliance" or even a commercially reasonable attempt to comply with the FSA. I am compelled to conclude that the FSA bars this plaintiff's attempt to enforce its security interest against the defendant McCombs.

IT THEREFORE HEREBY IS RECOMMENDED that the defendant's motion for summary judgment, filing # 16, be granted.

Dated September 19, 1990.