**FIRST BANK, Plaintiff,**

v.

**EASTERN LIVESTOCK CO., Defendant.**

**Civ. A. No. J92–0469(L)(C).**

United States District Court,
S.D. Mississippi,
Jackson Division.

July 27, 1993.

---

Dennis Horn, Horn & Payne, Jackson, MS, for plaintiff.

Edward P. Lobrano, Jr., Jackson, MS, for defendant.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the motion of plaintiff First Bank and the cross motion of defendant Eastern Livestock Company (Eastern) for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Each party has responded to the motion of the other and the court has considered the memoranda of authorities, together with attachments, submitted by the parties. The court concludes, based on its review of applicable authorities and its evaluation of the parties' evidence, that both parties' motions must be denied.

### FACTS

Eastern is a company which is engaged in the day-to-day purchase of farm products (cattle). Beginning in January 1989, Eastern engaged in cattle purchase and sales transactions with one Harry Wells, an individual in the business of buying and selling cattle. Through a series of cattle purchase confirmation contracts between Wells and Eastern, Wells took delivery of cattle from Eastern over a period of months and, after "fattening" the cattle, resold the cattle to Eastern by a date agreed upon by those parties in their contracts and at a prearranged price per pound. On May 23, 1989, Eastern tendered to Wells a check in the amount of $253,647.92, representing payment for the fatted cattle that Wells resold to it under the contracts.

First Bank, contending that it held a prior perfected security interest as to the cattle involved in these transactions, brought this action for conversion against Eastern seeking to recover the full amount paid by Eastern to Wells. On its present motion for summary judgment, First Bank alleges that it did all that was necessary under the law to perfect its security interest in the cattle which Eastern purchased from Wells and that Eastern, despite having both actual and constructive notice of the Bank's lien, paid the entire

purchase price for the cattle to Wells alone, in violation of the Bank's security interest. Finally, First Bank avers that Wells, though indebted to it for a sum in excess of the $253,647.92 paid to him by Eastern, has never accounted to or paid First Bank any of the money which Eastern paid to him. Thus, First Bank argues that it is entitled to summary judgment against Eastern on its complaint for conversion. Eastern denies that First Bank is entitled to judgment in its favor, and claims, to the contrary, that judgment should be entered for Eastern since First Bank did not have a perfected security interest in the subject cattle.

One who violates a valid security interest of a financial institution by not accounting to that financial institution for its security interest is subject to liability for conversion of the institution's funds. *See Oxford Production Credit Ass'n v. Dye*, 368 So.2d 241 (Miss. 1979); *United States v. Harrell's Stockyards, Inc.*, 652 F.Supp. 452 (S.D.Miss.1987). The issue presented by this case is whether Eastern purchased cattle from Wells subject to a prior perfected security interest by First Bank. The answer to the question depends, ultimately, on whether First Bank had a valid security interest in the cattle that was the subject of the Eastern/Wells transaction and if so, whether it complied with the requirements of state and federal law pertaining to the giving of notice of its alleged security interest to prospective buyers of the cattle, including Eastern.

## THE FOOD SECURITY ACT AND MISSISSIPPI'S CENTRAL FILING SYSTEM

In 1985, Congress, finding that certain State laws allowed a secured lender to "enforce liens against a purchaser of farm products even if the purchaser [did] not know that the sale of the products violate[d] the lender's security interest in the products, lack[ed] any practical method for discovering the existence of the security interest, and

1. Cattle are "farm products." Under the FSA, "[c]attle & calves" are listed as farm products. And the term "farm products" is expressly defined by the state regulations to include "an

ha[d] no reasonable means to ensure that the seller use[d] the sales proceeds to repay the lender," 7 U.S.C. § 1631(a), passed the 1985 Farm Bill, popularly known as the Food Security Act (the FSA), "to remove [the] burden on and obstruction to interstate commerce in farm products" caused by such State laws, 7 U.S.C. § 1631(b). In order to make information more readily available to purchasers of farm products, the FSA provides for the establishment by each state of a "central filing system" in order that lenders may file "effective financing statements ... on a statewide basis." 7 U.S.C. § 1631(c)(2). This is accomplished by the lender's filing of the prescribed financing statement with the office of the State's Secretary of State. Under the FSA, the State's Secretary of State is required to maintain a master list of all financing statements filed by lenders, and to make that list available on a regular basis to buyers of farm products who register to receive information concerning debtors. 7 U.S.C. § 1631(c)(2)(D). Buyers who do not register pursuant to subsection (c)(2)(D) may nevertheless receive information concerning a debtor by requesting such information of the Secretary of State in accordance with the procedures established by the FSA.

On December 24, 1986, following Congress' enactment of the FSA, Mississippi's Secretary of State prescribed regulations for the implementation of a central filing system in conformity with the requirements set forth in the FSA for the centralized filing of security interest documents covering farm products. *See* Miss.Code Ann. § 75–9–319 (directing Secretary of State to issue regulations).[1] The FSA provides that "in the case of a farm product produced in a State that has established a central filing system," a buyer of farm products will take such products subject to a security interest created by the seller if

(A) the buyer has failed to register with the Secretary of State of such State prior to the purchase of farm products; and

agricultural commodity such as ... a species of livestock such as cattle ... that is in the possession of a person engaged in farming operations." Miss. Central Filing Sys.Reg. § 2.01(G).

(B) the secured party has filed an effective financing statement or notice that covers the farm products being sold....

7 U.S.C. § 1631(e)(2).[2] Unless these conditions are satisfied, then,

notwithstanding any other provision of Federal, State, or local law, a buyer who in the ordinary course of business buys a farm product from a seller engaged in farming operations shall take free of a security interest created by the seller, even though the security interest is perfected; and the buyer knows of the existence of such interest.

7 U.S.C. § 1631(d).[3] Mississippi law similarly provides:

[A] secured party may not enforce a security interest in farm products against a buyer ... who purchases or sells farm products in the ordinary course of business from or for a person engaged in farming operations unless the secured party has complied with the regulations issued by the Secretary of State under Section 75–9–319 or unless the buyer ... has received from the secured party or seller written notice of the security interest which complies with the requirements of Section 1324 of the Food Security Act of 1985....

Miss.Code Ann. § 75–9–307(4). And the state regulations explain:

Upon filing in the system, buyers ... not registered with the system are subject to the security interest in that product wheth-er or not they know about it, even if they are outside the state.

Miss. Central Filing Sys. Reg. § 2.05(B).

In the case at bar, it is undisputed that Eastern was not registered with the Secretary of State under Mississippi's central filing system.[4] Consequently, Eastern would be subject to a security interest by First Bank reflected in any "effective financing statement" filed by First Bank with the Secretary of State. The issue is whether First Bank filed an "effective financing statement" which covered the cattle that was the subject of the Wells/Eastern transaction. In this regard, the evidence shows that on April 2, 1987, First Bank filed a financing statement (a UCC–1F)[5] with the Secretary of State which showed Harry Butler Wells as the debtor and which, following the space on the form providing, "This Financing Statement covers the following types (or items) of property," recited:

All Beef and Dairy Cattle, branded or unbranded, including cows, calves, heifers, steers, and bulls, now owned by Debtor or hereafter acquired, and all farm supplies and farm equipment now owned by Debtor or hereafter acquired. Livestock to be kept on real estate owned by Bobby Caston and located on HWY 569, Amtie [sic] County, Ms. and leased by Debtor.

The FSA prescribes the information which an "effective financing statement" must contain:

---

**2.** There are other means under these laws of subjecting the buyer to the security interest, though none are applicable here. For example, a buyer that has not registered but which receives from the Secretary of State written notice that the seller and the farm product being sold are subject to an effective financing statement and which does not secure a waiver or release of that security interest from the secured party, will take subject to the security interest. 7 U.S.C. § 1631(e)(3). Additionally, the secured party may enforce its security interest against the buyer if the secured party provides the buyer with timely written notice of that party's security interest. 7 U.S.C. § 1631(e)(1). There is no contention here that the Secretary of State provided any notice to Eastern of any lien held by First Bank. And, First Bank, which maintains that it filed an effective financing statement, readily admits that it did not send written notice to Eastern of its claimed security interest.

**3.** The FSA defines a "buyer in the ordinary course of business" as "a person who, in the ordinary course of business, buys farm products from a person engaged in farming operations who is in the business of selling farm products." It is undisputed that Eastern was a "buyer in the ordinary course of business" as that term is defined by the FSA.

**4.** Initially, in response to interrogatories by First Bank, Eastern reported that it was registered under the system. Eastern has now advised that its response was in error since, while it had in good faith asserted that it was a registrant under the state regulations, it has since learned that it was not, in fact, registered.

**5.** Under the state regulations, the UCC–1F is the official form to be used as an effective financing statement.

(i) the name and address of the secured party;

(ii) the name and address of the person indebted to the secured party;

(iii) the social security number of the debtor or, in the case of a debtor doing business other than as an individual, the Internal Revenue Service taxpayer identification number of such debtor;

(iv) *a description of the farm products subject to the security interest, including the amount of such products where applicable; and a reasonable description of the property, including county or parish in which the property is located* [.]

7 U.S.C. § 1631(c)(4) (emphasis supplied). Mississippi's regulations similarly require that an effective financing statement include a "description of farm products subject to the security interest to include county where collateral produced and amount of such product where applicable." Miss. Central Filing Sys. Reg. § 1.00(D). The regulations also provide for the inclusion in an effective financing statement of

further details of the farm product subject to the security interest if needed to distinguish it from other such product owned by the same person but not subject to the particular security interest.

Miss. Central Filing Sys.Reg. § 2.01(H). Finally, as is pertinent here, the regulations state, at section 5.04, under the heading "AMOUNT AND REASONABLE DESCRIPTION," that:

\* \* \* \* \* \*

(C) Any EFS and master list entry will identify each county in Mississippi where the product is produced. If no further identification of the location of the product is shown, this means that all such product in each such county owned by such person is subject to the security interest.

(D) The need to supply additional information arises only where some of that product owned by that person is subject to the security interest and some is not.

(E) The additional information about amount and property must be sufficient to enable a reader of the information to identify what product owned by that person is

subject [to the security interest], as distinguished from what of the same product owned by the same person is not subject. The precision needed, in the description of the amount and location, will vary from case to case.

(F) The basis for this is to make information available as necessary to enable an identification of what product is subject to a security interest as distinguished from what is not.

## ANALYSIS

There is no doubt that First Bank's April 2, 1987 financing statement is an "effective financing statement" that would have covered all cattle which Wells then owned or thereafter acquired which were "kept on real estate owned by Bobby Caston and located on HWY 569" in Amite County. However, it is uncontroverted that Wells, the debtor, lost the lease on the real estate owned by Bobby Caston on Highway 569 in Amite County in approximately May 1987, a month after this financing statement was filed, and that he has neither leased the property nor had cattle on the property since that time. More to the point, none of the cattle involved in the Eastern/Wells transaction was ever pastured "on real estate owned by Bobby Caston and located on HWY 569" in Amite County. Thus, what must be determined as between Eastern and First Bank is whether the Bank's financing statement is an "effective financing statement" as to cattle which were never kept on the Bobby Caston property, including the cattle which Eastern purchased from Harry Wells. In other words, does this financing statement "cover the farm products being sold" by Wells to Eastern in 1989? To answer this question requires a determination of whether the description of the collateral in the financing statement was sufficient to perfect a security interest in the cattle purchased by Eastern.

The parties in this case agree that in order to qualify as an "effective financing statement," the First Bank UCC–1F need not have specifically identified the location of the

cattle subject to the security interest.[6] Their disagreement stems from the language in the document which refers to the location of secured property:

> Livestock to be kept on real estate owned by Bobby Caston and located on HWY 569, Amtie [sic] County, MS. and leased by Debtor.

First Bank asserts that inasmuch as the secured property was not required to be described as to location, "[t]he language as to the location of the cattle being on a certain farm is surplusage." First Bank further describes this language as a "minor addendum." Eastern, on the other hand, disputes First Bank's characterization of this language, and maintains instead that the language was specifically and intentionally included for the very purpose of "distinguish[ing] [the cattle subject to First Bank's security interest] from other [cattle] owned by [Wells] but not subject to [First Bank's] security interest." In support of its position, Eastern has submitted the affidavit of Harry Wells, the debtor. Wells explains that in the early part of 1987, he borrowed money from First Bank and pledged as security the cattle purchased with the loan proceeds. Wells states that the location of the livestock was inserted on the financing statement

> [f]or proper identification of the livestock that was subject to the instrument.... This [language] was expressly inserted so that the livestock subject to the UCC–1F could be distinguished from other livestock which might have been financed by other persons as I was, on a daily basis, engaged in the buying and selling of cattle throughout all time periods relevant hereto.

■ It is apparent that in the circumstances of this case, summary judgment cannot be entered for First Bank. While the parties have addressed, at length, the requisites for perfection of First Bank's claimed security interest, it has become evident that this case concerns not only whether First Bank *perfected* a security interest in the disputed cattle, but more fundamentally, whether it actually had a security interest in the cattle that were the subject of the Eastern/Wells transactions. "In order to create an effective security interest under the UCC, there must be a written security agreement containing a description of the collateral." *Federal Land Bank of St. Paul v. Bay Park Place, Inc.*, 162 Mich.App. 1, 5, 412 N.W.2d 222, 224 (1987). That is, a security interest "attaches" when the debtor signs a valid security agreement which covers the collateral. *See* Miss.Code Ann. § 75–9–203(1)(a).[7] That security interest is "perfected" when the secured party files an effective financing statement including, *inter alia*, "a description of the farm products subject to the security interest" established by the security agreement. A financing statement does not create a security interest and cannot extend a security interest beyond what is described in the security agreement. *Bay Park Place*, 412 N.W.2d at 224; *In re Mann*, 318 F.Supp. 32, 36 (W.D.Va.1970) ("A financing statement cannot add collateral not described in the security agreement.").

■ Though First Bank asserts in the case at bar that it acquired a security interest in all cattle purchased by Harry Wells from and after June 1984, it has presented no evidence to substantiate its claim. That is, it has not presented a security agreement showing the source, nature or extent of its claimed security interest.[8] Before there could be any definitive answer to the question whether First Bank *perfected* a security

---

6. The FSA does require, however, that there be a reasonable description of the property, including the county in which it is located.

7. That statute provides, in pertinent part:
 [A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless
 (a) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral....

8. First Bank asserts in its brief that the "existence of a signed security agreement ... is not in issue here." That may be true, in that Eastern does not contend that there was not a security agreement between First Bank and Wells. However, Eastern vigorously disputes the reach of the security agreement, and the substance of the agreement has not been revealed to the court. The court is unable, therefore, to conclude with any assurance that the cattle at issue were subject to that security agreement.

interest in the subject cattle, there must be a determination of the actual nature and scope of First Bank's security interest in Wells' property. Since a necessary prerequisite to First Bank's perfecting a security interest is First Bank's *having* a security interest to perfect, then in the absence of proof concerning the nature and scope of First Bank's security interest in Wells' property,[9] the court could not grant First Bank's request for summary judgment even if the financing statement clearly covered *all* of Wells' livestock, without reference to any limitation as to location.[10] That being said, the court still must decide whether Eastern is entitled to summary judgment.

 Even assuming *arguendo* that First Bank had a valid security interest in the Eastern cattle, the issue on Eastern's motion for summary judgment is still whether the description in the financing statement of the collateral subject to First Bank's security interest was sufficient to cover the cattle that were purchased by Eastern. The Bank's

financing statement refers to "[a]ll ... Cattle ... now owned by Debtor or hereafter acquired." If it said nothing more, then there would be no need to proceed further, for the court would not hesitate in that circumstance to conclude that the cattle at issue were unequivocally covered by the description. But the description does not stop there. Rather, it goes on to state, "Livestock to be kept on real estate owned by Bobby Caston and located on HWY 569, Amtie [sic] County, Ms. and leased by Debtor." While First Bank asserts that the additional language concerning the location of the cattle was "mere surplusage," the language, in the court's opinion, renders the financing statement at least ambiguous. *See In re Tri–State Equip., Inc.*, 792 F.2d 967, 970 (10th Cir.1986) (sufficiency of notice given by financing statement must be answered primarily by referring to law); *Wilson v. United States Fidelity & Guar. Co.*, 830 F.2d 588 (5th Cir.1987) (whether ambiguity exists is a question of law).[11] But what is the effect of

9. Of course, the Bank has presented the affidavit of its president, James W. Covington, who states that Wells borrowed money, that he mortgaged the cattle and that he has not repaid the money. However, it has offered no documentary evidence to support these assertions and, in the face of Wells' affidavit controverting the Bank's allegations concerning the extent of its interest in his cattle and whether he has repaid the money, Covington's affidavit cannot be deemed sufficient to establish anything.

10. The significance of the omission of proof on this point is clear when it is recalled that the debtor himself, though not a party to this action, maintains that the bank was not granted a security interest in all of his livestock, but only in livestock kept at a certain identified location.

11. Eastern argues that had First Bank intended that the description in the financing statement cover cattle not located on the Bobby Caston property, and had it wanted to protect its interest in all of Wells' cattle, then once the Bank learned that none of his cattle were being pastured on the Caston property, it should have amended the description relating to location of the cattle since, according to Eastern, the change of location would have been a "material change" under the applicable statutes and regulations. *See* 7 U.S.C. § 1631(c)(4)(E) (an "effective financing statement ... must be amended in writing, within three months, to reflect material changes...."); *Miss. Central Filing Sys.Reg.* § 2.04 ("The requirement to amend arises when the information already made available no longer

serves the purpose (for which the information is supplied) and other information is needed in order to do so."). First Bank, on the other hand, takes the position that any change with respect to the location of the debtor's cattle would not have been material inasmuch as the description in the April 2, 1987 financing statement was sufficient when filed to cover *all* of the debtor's cattle, then owned or after-acquired, without regard to where any such cattle may have been located.

Clearly, a secured party may acquire a security interest in after-acquired property and, if such after-acquired property is sufficiently identified in the security agreement and financing statement, then there is no need for the secured party to amend the financing statement or file a new one each time the debtor acquires additional covered property. *See United States v. Pete Brown Enter., Inc.*, 328 F.Supp. 600 (N.D.Miss. 1971); Miss.Code Ann. § 75–9–108; § 75–9–204. Contrary to the Bank's apparent impression, Eastern does not contend that First Bank could not have acquired and perfected a security interest in after-acquired cattle. Rather, the crux of Eastern's position is that the UCC–1F filed by First Bank did not accomplish this result, since, while it purported to apply to after-acquired livestock, it at the same time limited *its* coverage to livestock—whether then owned *or* after-acquired—which were kept at the location described in the financing statement. The financing statement was obviously sufficient to cover after-acquired cattle. The question which this court must answer is whether the description in the April 2, 1987 financing statement was suffi-

that ambiguity?[12]

This court has located no case which has considered the sufficiency of a collateral description in an "effective financing statement" under the FSA, or the effect of an ambiguous description in an FSA financing statement. There is, however, a considerable body of law under the Uniform Commercial Code relating to when a financing statement with a misdescription, or with a vague or ambiguous description, will provide notice which is legally sufficient to perfect a security interest. *In re Tri–State Equip., Inc.,* 792 F.2d 967, 969 (10th Cir.1986). By far, the majority of courts addressing the adequacy of financing statements under the U.C.C. have held that a financing statement, in order to perfect a security interest, need not specifically identify the property which is the subject of a security interest; rather, it is sufficient if the description would put a reasonably prudent prospective lender or buyer on notice that the collateral sought to be purchased or encumbered might be the subject of a preexisting security interest. *See, e.g., In re McBee,* 714 F.2d 1316, 1321 (5th Cir.1983) (critical inquiry in assessing whether security interest is perfected is "whether a reasonably prudent subsequent creditor would have discovered the prior security interest."); *United States v. Crittenden,* 600 F.2d 478, 480 (5th Cir.1979) (whether record

gives sufficient notice " 'depends . . . on what a person of ordinary business prudence would have found out from pursuing such lines of inquiry as the data given . . . would naturally suggest to his mind' ") (quoting *Yancy Bros. v. Dehco,* 108 Ga.App. 875, 877–78, 134 S.E.2d 828, 831 (1964)). That is because the sole function of financing statements under the U.C.C. is to put third parties—usually prospective buyers or lenders—on notice that there may be an enforceable security interest in the property of the debtor. *Kubota Tractor Corp. v. Citizens & Southern Nat'l Bank,* 198 Ga.App. 830, 833, 403 S.E.2d 218, 222 (1991). And, "[s]ince the financing statement is designed only to provide general notice or warning that certain collateral might already be encumbered," *Production Credit Ass'n v. Bartos,* 430 N.W.2d 238, 241 (Minn.Ct.App.1988), the financing statement "need not provide interested parties with all of the information he needs to understand the secured transaction, but only with the information that such a transaction has taken place and that the particulars thereof may be obtained from the named secured party at the address shown." *South County Sand & Gravel Co. v. Bituminous Pavers Co.,* 106 R.I. 178, 256 A.2d 514 (1969). *See also Thorp Commercial Corp. v. Northgate Indus., Inc.,* 654 F.2d 1245, 1248 (8th Cir.1981) ("The description of collateral

cient to cover after-acquired cattle of the debtor which were not located on the Bobby Caston property.

Given that this is the issue, the parties' arguments concerning amendments for material changes is of no real consequence. If the financing statement was sufficient when filed to cover the cattle that are the subject of the parties' dispute in this case, then First Bank obviously would have had to do nothing further to perfect its interest in such cattle, i.e., amend the description. And if the financing statement was only sufficient, when filed, to cover cattle located on the Bobby Caston property, then it is equally clear that in order for additional cattle to have become covered by the financing statement, First Bank would have had to amend the description to include such additional cattle, something which the Bank agrees it did not do. The court reiterates, though, that the only question of real importance is whether the description covered after-acquired cattle which were never located on the Bobby Caston property.

**12.** First Bank suggests that Eastern cannot prevail regardless of the sufficiency of the description since the location language in the financing

statement could not have had any impact on Eastern Livestock inasmuch as Eastern "failed to inform itself as to the contents of any UCC–1F." However, that Eastern did not register with Mississippi's Secretary of State does not relieve the Bank of its obligation to file an effective financing statement covering the property in dispute. The FSA provides unequivocally that unless the buyer fails to register *and* the secured party files an effective financing statement covering the property, the buyer will take free of the security interest. The burden is on the secured party, in the first instance, to protect its interest in collateral by doing what is required by the FSA, i.e., giving written notice in compliance with the FSA or, alternatively, filing an effective financing statement covering the subject property. Only if it does so may the secured party receive protection afforded by the FSA. *See Lisco State Bank v. McCombs Ranches, Inc.,* 752 F.Supp. 329 (D.Neb.1990) (only if secured party avails itself of options provided by FSA will burden of statutory compliance shift to buyer).

in the financing statement does not function to identify the collateral and define property which the creditor may claim, but rather to warn other subsequent creditors of the prior interest."); *United States v. Southeast Mississippi Livestock Farmers Ass'n,* 619 F.2d 435, 439 (5th Cir.1980) (Mississippi law) (description sufficient if a reasonable party examining the financing statement would have been alerted to direct an inquiry to secured party to determine what, if any, security interest in collateral was held by secured party); [13] *Crittenden,* 600 F.2d at 480 ("[W]hile not wholly necessary that physical description appearing of record be sufficient in itself to identify the property, it must raise a warning flag, as it were, providing a key to the identity of the property.") (quoting *Yancy Bros, supra*); *Bay Park Place,* 412 N.W.2d at 224 ("Even though the instrument lacks details, if it gives clues sufficient that third persons by reasonable care and diligence may ascertain the property covered, it is adequate."); *Kubota,* 403 S.E.2d at 222 ("[A] financing statement is designed to notify third parties that there may be an enforceable security interest in the property of the debtor."); *In re Wood,* 38 Bankr. 375, 377 (Bankr.D. Idaho 1983) ("The function of the financing statement requirement is to give notice of a potential interest in property of a specifically identified debtor as well as means by which an inquiring party may acquire more detailed information concerning that interest."); *In re Hemminger,* 20 Bankr. 357, 360 (Bankr.W.D.Pa.1982) ("[T]he purpose of the financing statement is merely to warn creditors, rather than identify collateral.").

Given the notice function served by U.C.C. financing statements, most courts which have addressed the issue have held that a financing statement is sufficient to perfect a security interest, even if information in it is vague or ambiguous, so long as the information is not "seriously misleading." *See In re Waters,* 90 Bankr. 946, 960 (Bankr.N.D.Iowa 1988) ("key is whether a potential creditor would have been misled"); *In re King,* 30 Bankr. 2, 4 (Bankr.E.D.Tenn.1983) (even if some ambiguity existed, "description was adequate to afford notice to interested parties that the Bank claimed a security interest in plaintiffs' computer equipment"); *In re TriState Equip.,* 792 F.2d at 972 ("even an imprecisely worded statement can be sufficient;" question is whether description is "so 'seriously misleading' . . . that it would simply stop future creditors from making the further inquiries they were obligated by the U.C.C. to make"); *In re McBee,* 714 F.2d at 1321 ("Perfect accuracy . . . is not required as long as the financing statement contains sufficient information to 'put any searcher on inquiry'."). Only where the financing statement does not perform its notice function by reason of an inadequate, ambiguous or misleading description of the encumbered property will it be deemed insufficient to constitute perfection of the secured party's interest in the collateral. *See Thorp Commercial Corp.,* 654 F.2d at 1252 ("The financing statement would not provide notice where the description of collateral is misleading, for example, if the description were simply wrong or if the description seemingly would not cover the collateral but contained coverage under some hidden ambiguity that could not be considered reasonable notice."); *In re Copper King Inn, Inc.,* 918 F.2d 1404, 1408 (9th Cir.1990) (financing statement insufficient where hypothetical creditor could have been led astray); *In re Katz,* 563 F.2d 766, 767 (5th Cir.1977) (where language of financing statement would not have alerted subsequent potential secured party to need for additional inquiry concerning whether debtor's inventory was encumbered, prior se-

---

13. There are no Mississippi cases addressing the sufficiency of descriptions in U.C.C. financing statements. However, Mississippi has adopted the provisions of the U.C.C. addressed in these various cases relating to the sufficiency of financing statements. Specifically, Miss.Code Ann. § 75–9–110 requires that "any description of personal property . . . is sufficient whether or not it is specific if it reasonably identifies what is described. . . ." And under Mississippi law, a U.C.C. financing statement can operate to perfect a security interest in collateral even though it contains "minor errors which are not seriously misleading." Miss.Code Ann. § 75–9–402(8). Thus, the Fifth Circuit has concluded that Mississippi would adopt the view of the majority of courts that a description is adequate if it merely provides notice of the need for additional inquiry. *United States v. Southeast Mississippi Livestock Farmers Ass'n,* 619 F.2d 435, 438 (5th Cir.1980).

cured party's security interest in inventory was unperfected).[14]

These principles pertaining to U.C.C. financing statements are derived from application of specific U.C.C. provisions. The court in *In re Tri–State Equipment, Inc.,* 792 F.2d 967 (10th Cir.1986), was faced with a financing statement which, on its face, revealed three possible interpretations of what was described. The question was, therefore, "what effect a financing statement has, when the language it uses has several distinct meanings." *Id.* at 970. The answer to that question was found in these Code provisions:

> Section [9–402(1)] broadly commands that a financing statement "is sufficient if it contains a statement *indicating the types, or describing the items,* of collateral" (emphasis added). Similarly, § [9–402(8)] provides that a financing statement "substantially complying with requirements of this section is effective even though it contains minor errors which are not seriously misleading." And § [9–110] states that "any description of personal property [under this Article] is sufficient ... whether or not it is specific if it reasonably identifies what is described."

*Id.* The court noted that these provisions evidenced the U.C.C.'s "broad policy of lenity," and went on to explain further:

> It was the stated intent of the drafters of the U.C.C. financing statement rule to create only a "simple" system of "notice filing," with minimal formal requirements. *See* § [9–402] official comment, 1–2. Under the U.C.C. system, a proper financing statement will show "merely that the secured party who has filed *may* have a security interest in the collateral described." *Id.* official comment 2 (emphasis added). The drafters frankly acknowledged their expectation that, after a potential lender has encountered a financing statement, "further inquiry ... will be necessary to disclose the complete state of affairs." *Id.* ...

The burden is placed on later creditors to protect themselves by getting full information on any prior agreements flagged by the minimal financing statement filing.

For these reasons, the settled rule ... is that the description in the filing "need only *put other creditors on notice of a possible security interest in the collateral* in question." ... Most other courts are also now willing to find a description that is unclear or susceptible to more than one distinct meaning sufficient in circumstances in which the description would put other creditors on notice of the need for further inquiry.

*Id.* (quoting *Platte Valley Bank v. B. & J. Constr., Inc.,* 44 Colo.App. 21, 606 P.2d 455, 456 (Colo.App.1980) (additional citations omitted)). *See also Thorp Commercial Corp.,* 654 F.2d at 1249.

It seems reasonably clear, and the cited cases support the notion that a financing statement, though ambiguous, may nevertheless provide adequate notice to a prospective purchaser or lender that such party should make further inquiry to ascertain the extent of the collateral covered by a secured party's agreement with the debtor. That is, a description in a financing statement may induce further inquiry by a prospective purchaser or lender in spite of an ambiguity in the description. Essentially, the question is one of degree: Is the description so ambiguous that a party reading it might not reasonably comprehend that the property sought to be purchased or further encumbered is covered, or is the ambiguity such as would indicate to the party reading it that he should undertake additional inquiry from external sources (e.g., the secured party) to ascertain whether the property at issue is, in fact, subject to a preexisting security interest. If the ambiguity were misleading such that it could not be considered to provide reasonable notice that the subject property was encumbered, then the financing statement would not constitute perfection of that security interest.

---

**14.** A few courts have held that an ambiguous or vague description, in and of itself, will prevent perfection of a security interest, without reference to whether the description would alert third parties to the need for inquiry. *See, e.g., In re Middle Atlantic Stud Welding Co.,* 503 F.2d 1133 (3d Cir.1974). But this is a distinctly minority position.

In the case at bar, the description in First Bank's UCC–1F is obviously ambiguous, and if, as the Bank claims, it was intended to cover cattle other than cattle located on the Bobby Caston property, it could, on a cursory reading, perhaps prove somewhat misleading. However, having carefully considered the description at issue in this case, the court does not consider that the description provided by First Bank in its financing statement is seriously misleading such that a reasonably prudent buyer would not have been on notice that it should pursue available avenues of inquiry to determine the meaning of the language used in the description. That is, while a reader could not have gleaned from this description exactly what was covered, neither could a reader have been assured by the description that all of Wells' cattle were not covered.[15]

The FSA, like the U.C.C.'s financing statement provisions, was established as a means of providing notice to third parties of security interests created by debtors and is concerned primarily with notice. That is, the FSA, like the U.C.C. financing statement provisions, is notice-oriented. *See Lisco State Bank v. McCombs Ranches, Inc.,* 752 F.Supp. 329, 338 (D.Neb.1990) (The FSA "is intended principally as a notice statute to protect buyers of farm products from the threat of double payment."). The two enactments are arguably distinguishable in that the avowed purpose of the FSA is for the protection of *buyers,* not lenders. However, while the FSA is intended to protect buyers of farm products, it is meant only to protect them from the dangers of double payment where they might not know, or have any practical means of learning of a preexisting security interest in property. In other words, the protection afforded buyers is simply *notice* of security interests created by their sellers. A second distinction is revealed by a comparison of the language of the statutes as they relate to the identification of collateral. It appears that the requirements under the FSA relating to collateral description may be stricter than those of the U.C.C. Whereas a U.C.C. financing statement need only contain "a statement indicating the types, or describing the items, of collateral," an effective financing statement under the FSA must contain "a description of the farm products subject to the security interest...."[16] However, as does the U.C.C., the FSA will recognize an effective financing statement as sufficient if it "substantially complies with the requirements [relating to information which must be included] even though it contains minor errors that are not seriously misleading." 7 U.S.C. § 1631(c)(4)(I). *See also Lisco,* 752 F.Supp. at 337 (FSA "allows for some deviation from stated requirements [for effective financing statements] if such departure is not 'misleading'."). In this court's view, the proper focus should be, not on whether the

---

15. The requirements for descriptions in security agreements are stricter than the requirements applicable to financing statements, because these documents perform wholly different functions. *See In re Turnage,* 493 F.2d 505, 506 (5th Cir. 1974) ("[T]he purpose of [security agreements] is to express the intent of the parties, not merely to instigate further inquiry by third parties. Thus the description of collateral in the security agreement is subject to stricter standards of specificity than is that in the financing statements."); *Bartos,* 430 N.W.2d at 240 (description in security agreement must be sufficiently specific for the parties to identify the collateral subject to the agreement while description in financing statement does not serve to identify the collateral but only warn other subsequent creditors of the prior interest). If the same description contained in First Bank's financing statement appeared in Wells' security agreement, a serious question of sufficiency of the security agreement would be presented inasmuch as this description fails to identify what collateral is covered. The court

would have difficulty concluding that this description was sufficient to create a security interest in any cattle other than those head which were located on the Bobby Caston property.

16. In *Lisco,* the court, though it was not addressing the issue of the adequacy of a *description* under the FSA, suggested that an error which would not be treated as "minor" under the U.C.C. might be considered "minor" under FSA given "the difference in purpose between the U.C.C. and the FSA." *Lisco,* 752 F.Supp. at 338. The court observed that while the FSA is principally a notice statute, the provisions of Article 9 of the U.C.C., "while also designed to give notice, are also intended to effectuate creation and perfection of security interests for the protection of and the resolution of priority claims among secured parties." *Id.* In other words, the FSA, as contrasted with the U.C.C., is purely a notice statute.

lender could have made itself more clear,[17] but rather on whether the financing statement is adequate to warn prospective purchasers that there is a pre-existing security interest. And, as the court has determined, the description here was sufficient to put potential purchasers such as Eastern on notice that inquiry was necessary to determine (or at least clarify) the extent of the Bank's security interest. The court must therefore conclude that summary judgment may not be entered for Eastern.

 First Bank argues that regardless of the disposition of the issue of whether First Bank's UCC–1F was sufficient, it is entitled to summary judgment since Eastern had actual notice of First Bank's security interest by virtue of Wells' having identified First Bank as a lienholder on a certain cattle purchase confirmation contract with Eastern. However, whether Eastern had actual notice of the Bank's claimed security interest is not material. The Act provides the only means by which a buyer may be made subject to a security interest, i.e., filing of an "effective financing statement" or providing "written notice," and explicitly states that unless one of those methods is followed, then a buyer who buys a farm product in the ordinary course of business from a seller engaged in farming operations takes free of a security interest created by the seller, even if "the buyer knows of the existence of such interest." Thus, actual notice is not relevant, unless such actual notice is imparted to the buyer *by the secured party* in the manner prescribed by the Act.[18]

Based on the foregoing, it is ordered that the motions of both parties for summary judgment are denied.

ORDERED this 27th day of July, 1993.

---

**17.** Had the collateral, in fact, included all the cattle then owned by Wells or thereafter acquired by him, regardless of where located, the Bank, which no doubt drafted the financing statement, could have conveyed that meaning easily enough merely by omitting any language about location or including the familiar phrase, "including but not limited to."

**18.** The court would note that there is, in any event, a factual dispute between the parties concerning whether Eastern, in fact, had actual notice as claimed by the Bank.