**FARM CREDIT SERVICES OF MID AMERICA, ACA, Appellee,**

v.

**RUDY, INC., Appellant.**

[Cite as *Farm Credit Serv. of Mid–America, ACA v. Rudy, Inc.* (1996), 113 Ohio App.3d 93.]

Court of Appeals of Ohio,
Second District, Miami County.

No. 95–CA–54.

Decided July 26, 1996.

94

*Ray A. Cox,* for appellee.

*Michael A. Baer,* for appellant.

BROGAN, Presiding Judge.

Rudy, Inc. appeals from the judgment of the Miami County Common Pleas Court which granted judgment in the amount of $21,810.74 plus interest to Farm Credit Services of Mid–America, ACA ("FCS").

Appellee FCS is a federally chartered entity created pursuant to the Farm Credit Act, Section 2001, Title 12, U.S.Code. It makes short-, intermediate-, and long-term loans to farmers. Short-term loans include operating loans which are usually disbursed in the spring, and paid back in the fall when crops are harvested. FCS is locally owned by farmers who are its borrowers. Section 2094, Title 12, U.S.Code. FCS is a member of the Farm Credit System ("System"), and an instrumentality of the federal government. The Farm Credit Administration oversees the System and has adopted, through the Department of Agriculture, certain governing regulations.

FCS maintains various active loan offices around the state of Ohio, including one at Troy, Ohio. One of the Troy customers was Darryl A. Helstern. Helstern was an operating-loan customer of the Troy office for farming years 1990 and 1991 (that is, he borrowed the money in the spring of those years, and paid it back in the fall). To secure its position, FCS obtained security agreements and financing statements on all Helstern crops, growing or to be grown, including but not limited to all corn, wheat and soybeans, and any proceeds therefrom. Pursuant to the 1985 Farm Bill (popularly known as the Food Security Act of 1985 or FSA, Section 1631, Title 7, U.S.Code) and the subject matter herein, FCS obtained a list of potential purchasers of grain from Helstern. FCS then notified all potential purchasers on the list of its security interest, which included appellant Rudy, Inc. ("Rudy"), and demanded joint checks when and if grain was sold to them by Helstern.

In farming years 1990 and 1991, Helstern sold FCS-secured grain to Rudy. Rudy provided joint checks as required, and the FCS loans were paid in full for those years.

On November 22, 1991, FCS again loaned Helstern operating funds in the amount of $21,810.74 for 1992 crop input costs, which were to be repaid on or before January 1, 1992, as evidenced by a promissory note. What made this later

loan different from the previous Helstern loans was that it occurred in November 1991 rather than in January or February 1992. The reason the date was accelerated was to allow Helstern to take advantage of preseason discounts on seed, fertilizer, etc. for his 1992 crop.

As provided by FSA, a list of potential buyers and a notice of lien were prepared for this loan. In the column "crop year," FCS indicated "1991–1992." It is this notice, and more specifically the crop year designation "1991–1992," that is the sole issue in this case. FCS suggests that that designation includes crops harvested both in 1991 and 1992 while Rudy's position is that it includes only 1991.

Attached to the notice was the security agreement and financing statement covering all corn, wheat and soybeans, and proceeds therefrom, which was filed with Miami County, and with the state of Ohio. It is not contested that Rudy received a copy of the notice and attached security agreement and financing statement on or about November 29, 1991.

Helstern failed to pay the note when due. As of February 23, 1994, the amount due was $24,670.35, with a per diem of $6,057.95.

The notice of security interest served upon and received by Rudy contained the following language: "Buyer shall make the secured party a named payee with the check made payable to the order of debtor and the secured party, which check is ultimately honored by the drawee."

It is acknowledged that Helstern sold to Rudy all of his 1992 harvested grain, including corn and beans, commencing on October 13, 1992, when harvest commenced, and ending, apparently, on November 30, 1992, totaling $27,773.62. However, payments were made directly to Helstern, without FCS's name on the check(s), even though Helstern realized that FCS had an appropriate security interest in the grain.

Helstern did not pay these funds to FCS, and a cognovit judgment on the note was obtained against him on April 8, 1993. Helstern was discharged from this obligation pursuant to Chapter 7 of the Bankruptcy Code in Dayton, Ohio. He is now deceased. FCS made demand on Rudy for payment of proceeds from sale, but Rudy refused to make the payments.

In April 1995, FCS filed a complaint against Rudy in the Miami County Common Pleas Court seeking a judgment of $27,773.62 plus interest. Rudy answered and denied liability because it contended that it had not been properly notified of FCS's security interest pursuant to the requirements of the Food Security Act of 1985, Section 1631, Title 7, U.S.Code.

On August 22, 1995, the trial court granted FCS's summary judgment motion. The trial court found that the plaintiff was in substantial compliance with the

notice requirements of Section 1631, Title 7, U.S.Code, in providing the notice of its security interest on Helstern's crop on November 29, 1991. From that judgment, Rudy has perfected this appeal.

The appellant presented evidence that prior to 1991 the usual practice of FCS and other agricultural lenders in Ohio was to use a single-year designation in its notices of security interest in crops. Consistent with this practice, Rudy received a security-interest notice in early May 1990 regarding Helstern's bean and corn crop which contained a single-year "crop year" designation of 1990.

Pursuant to this notice Rudy honored the security interest and made Helstern and FCS copayees when in the fall of 1990 Helstern sold his crop to Rudy.

In 1991 FCS adopted a new policy which in some instances required the crop year designation in its security interest notices to include two or more different calendar years. That policy provided:

" 'Year' means:

"A. For a crop grown in soil, list the calendar year in which it is harvested or to be harvested. To be safe, list both the current year or the year it will be harvested, if different. If the customer has crops in storage from prior years upon which the Association has a lien, the Notices should include all of that specific farm product up to and including the current crop or the crop to be planted next."

It is undisputed that FCS did not notify Rudy or other buyers/elevators with which it dealt of this policy change.

In February 1991, Rudy received its *first* calendar year 1991 FCS Notice of Security Interest regarding Helstern's corn and beans, and this time the notice contained a dual-year crop year designation as follows: "Crop year 1991–1992." In the fall of 1991, Rudy, with the understanding, consistent with industry practice, that the crop year designation applied to Helstern's *1991* corn and beans, even if they were harvested or sold during the 1992 calendar year, again made its checks to Helstern for his 1991 corn and bean crop payable to Helstern *and* FCS as it had done in 1990.

Later during calendar year 1991 (on November 29, 1991) Rudy received a *second* Notice of Security Interest from FCS regarding Helstern's corn and beans, and the "crop year" designation was exactly the same as the one received (and honored) earlier that year, "1991–1992," even though now FCS intended the notice to apply to Helstern's *1992* corn and beans rather than his 1991 crop.

When Rudy received the second 1991 Notice of Security Interest (with crop year designation identical to the first one), Rudy's employee, Phyllis Cheadle, interpreted "91–92" the same way that Rudy had originally construed "91–92,"

checked Rudy's computer records, discovered that a lien had already been entered in the computer regarding Farmer Helstern's 1991 corn and bean crop, and so she made no additional entry.

FCS did not send Rudy a Notice of Security Interest regarding Helstern's corn and beans at any time during the 1992 calendar year, nor did it make any other communication to Rudy during 1992.

Appellant presented evidence that the FCS employee who was in charge of sending out the FCS Notices of Security Interest in 1992, Melissa Bowman, was under the mistaken impression that the duration of a security interest created under the statute was eighteen months rather than one year.

In mid–1992 (when all of the lapsed 1991 crop liens being carried by Rudy were purged from its computer per routine business practice) the computer entry relating to Helstern's 1991 corn and beans was deleted, so that when Helstern presented his 1992 corn and bean crop to Rudy in the fall of 1992, a check of the computer revealed no lien on those 1992 crops. Rudy did not make the checks for Helstern's 1992 corn and beans jointly payable to Helstern and FCS because it did not understand there to be a lien on those crops. Phyllis Cheadle did ask Helstern in the fall of 1992 whether he had a loan for his 1992 crops, and he replied that he didn't (although this is disputed by Helstern in his affidavit).

Although FCS had made no additional loans to Helstern after the one involved here (November 22, 1991), on March 9, *1993*, FCS sent Rudy a Notice of Security Interest regarding Helstern's corn and beans, which it again (as was the case with the November 1991 Notice of Security Interest) intended to be applicable to the same 1992 corn and bean crop, yet this time it designated the "crop year" as "*1992–1993*."

Except those of FCS beginning in 1991, in nearly all Notices of Security Interest received by Ohio elevators, a *single year* designation of crop year is utilized by the applicable agricultural lender.

Appellant presented evidence that a designation of crop year as "1991–1992" for corn and beans in a Notice of Security Interest would not be understood by the ordinary agribusiness grain seller, buyer, or lender in Ohio as describing, designating, or creating a lien in a farmer's *1992* corn and bean crop.

In three separate assignments of error, the appellant contends that the trial court erred in finding that the plaintiff had substantially complied with Section 1631(e), Title 7, U.S.Code, without considering the purpose of the statute, whether the crop year designated was ambiguous, and custom and usage in the industry.

■ Appellant argues that the use of a dual year designation such as "crop year 1991–1992" is ambiguous and confusing in the context of a Notice of Security Interest under the FSA. It argues that, considering the commonly accepted meaning according to custom and usage within the agricultural marketing business community in Ohio, such a designation would be understood by persons within such community to describe or designate corn and beans planted, grown, and harvested in the calendar year 1991, even if such 1991 crop is sold (or, in very rare instances, harvested) during calendar year 1992. Rudy states that it interpreted this designation to describe Helstern's 1991 corn and bean crop (even if they were being stored with Rudy into 1992).

Section 1631(e), Title 7, U.S.Code, provides:

"A buyer of farm products takes *subject to a security interest* created by the seller if—

"(1)(A) *within 1 year before the sale of the farm products, the buyer has received from the secured party or the seller written notice of the security interest* organized according to farm products *that*—

"(i) is an original or reproduced copy thereof;

"(ii) *contains,*

"(I) the name and address of the secured party;

"(II) the name and address of the person indebted to the secured party;

"(III) the social security number of the debtor or, in the case of a debtor doing business other than as an individual, the Internal Revenue Service taxpayer identification number of such debtor;

"(IV) *a description of the farm products* subject to the security interest created by the debtor, *including* the amount of such products where applicable, *crop year,* county or parish, and a reasonable description of the property * * *." (Emphasis added.)

Appellant argues that since the above statute designates "crop year" in the singular and limits the lien period to one year, the ambiguity arising from a designation of two calendar years for the "crop year" is obvious. Appellant argues that since there is an annual corn and bean crop, a designation of two successive calendar years is obviously confusing. Appellant argues that there was no reason for FCS to list 1991 in the November 1991 notice when it was intended to relate to Helstern's 1992 crop. Appellant notes that appellee further complicated the situation by sending a Notice of Security Interest on March 9, 1993 designating crop years 1992–1993, intending to encumber Helstern's 1992 crop, despite the fact that there had been no new loan transactions with Helstern since November 1991.

The appellee argues that there is nothing ambiguous about the designation 1991–1992. It argues that the issue of prevailing custom and usage is a red herring, as the federal statute controls. Appellee contends that the definition of "crop year" found in the Department of Agriculture regulations promulgated to assist in the implementation of the state filing system should also be used to define crop year in a presale notification system as in Ohio. Section 205.107, Title 9, C.F.R., defines crop year as follows:

"(a) the crop year * * * must be: (1) for a crop grown in soil, the calendar year in which it is harvested."

Appellee argues that under this definition the crops were harvested in 1992 and therefore were subject to a 1992 crop notice.

Most important, appellee contends that since the disputed notice was executed in late November 1991, the emphasis of the notice was for 1992 crops, it being too late to be concerned with 1991 crops except for those already harvested but yet unsold. Last, appellee argues that there is no prohibition in FSA of multiple-year designations of crops. Indeed, it argues that the Department of Agriculture suggests that a secured creditor may list "all" in its designation of crop year. See Section 205.107(B), Title 7, C.F.R., which provides that it is appropriate to include all the years covered by the security agreement and financing statement by simply stating "all" for crop year.

In *First Bank v. Eastern Livestock Co.* (S.D.Miss.1993), 837 F.Supp. 792, the court held that a financing statement stating that all owned or after-acquired cattle were covered and that the livestock were to be kept on identified property leased by the debtor was sufficient to put a reasonably prudent buyer on notice that inquiry was necessary to determine the extent of the security interest, even though the statement was ambiguous. The court noted that the buyer could not have been sure that alleged debtor's cattle outside the leasehold interest were covered.

District Judge Tom S. Lee noted, 837 F.Supp. at 799–801:

"This court has located no case which has considered the sufficiency of a collateral description in an 'effective financing statement' under the FSA, or the effect of an ambiguous description in an FSA financing statement. There is, however, a considerable body of law under the Uniform Commercial Code relating to when a financing statement with a misdescription, or with a vague or ambiguous description, will provide notice which is legally sufficient to perfect a security interest. *In re Tri–State Equip., Inc.*, 792 F.2d 967, 969 (10th Cir.1986). By far, the majority of courts addressing the adequacy of financing statements under the U.C.C. have held that a financing statement, in order to perfect a security interest, need not specifically identify the property which is the subject

of a security interest; rather, it is sufficient if the description would put a reasonably prudent prospective lender or buyer on notice that the collateral sought to be purchased or encumbered might be the subject of a preexisting security interest. *See, e.g., In re McBee,* 714 F.2d 1316, 1321 (5th Cir.1983) (critical inquiry in assessing whether security interest is perfected is 'whether a reasonably prudent subsequent creditor would have discovered the prior security interest.'); *United States v. Crittenden,* 600 F.2d 478, 480 (5th Cir.1979) (whether record gives sufficient notice ' "depends * * * on what a person of ordinary business prudence would have found out from pursuing such lines of inquiry as the data given * * * would naturally suggest to his mind" ') (quoting *Yancey Bros. v. Dehco,* 108 Ga.App. 875, 877–78, 134 S.E.2d 828, 831 (1964)). That is because the sole function of financing statements under the U.C.C. is to put third parties—usually prospective buyers or lenders—on notice that there may be an enforceable security interest in the property of the debtor. *Kubota Tractor Corp. v. Citizens & Southern Nat'l Bank,* 198 Ga.App. 830, 833, 403 S.E.2d 218, 222 (1991). And, '[s]ince the financing statement is designed only to provide general notice or warning that certain collateral might already be encumbered,' *Production Credit Ass'n v. Bartos,* 430 N.W.2d 238, 241 (Minn.Ct.App.1988), the financing statement 'need not provide interested parties with all of the information he needs to understand the secured transaction, but only with the information that such a transaction has taken place and that the particulars thereof may be obtained from the named secured party at the address shown.' *South County Sand & Gravel Co. v. Bituminous Pavers Co.,* 106 R.I. 178, 256 A.2d 514 (1969). *See also Thorp Commercial Corp. v. Northgate Indus., Inc.,* 654 F.2d 1245, 1248 (8th Cir.1981) ('The description of collateral in the financing statement does not function to identify the collateral and define property which the creditor may claim, but rather to warn other subsequent creditors of the prior interest.'); *United States v. Southeast Mississippi Livestock Farmers Ass'n,* 619 F.2d 435, 439 (5th Cir.1980) (Mississippi law) (description sufficient if a reasonable party examining the financing statement would have been alerted to direct an inquiry to secured party to determine what, if any, security interest in collateral was held by secured party); *Crittenden,* 600 F.2d at 480 ('[W]hile not wholly necessary that physical description appearing of record be sufficient in itself to identify the property, it must raise a warning flag, as it were, providing a key to the identity of the property.') (quoting *Yancey Bros, supra* ); [*Federal Land Bank v.*] *Bay Park Place* [162 Mich.App. 1], 412 N.W.2d [222] at 224 [ (1987) ] ('Even though the instrument lacks details, if it gives clues sufficient that third persons by reasonable care and diligence may ascertain the property covered, it is adequate.'); *Kubota,* 403 S.E.2d at 222 ('[A] financing statement is designed to notify third parties that there may be an enforceable security interest in the property of the debtor.'); *In re Wood,* 38 Bankr. 375, 377 (Bankr.D.Idaho 1983) ('The function

of the financing statement requirement is to give notice of a potential interest in property of a specifically identified debtor as well as means by which an inquiring party may acquire more detailed information concerning that interest.'); *In re Hemminger*, 20 Bankr. 357, 360 (Bankr.W.D.Pa.1982) ('[T]he purpose of the financing statement is merely to warn creditors, rather than identify collateral.').

"Given the notice function served by U.C.C. financing statements, most courts which have addressed the issue have held that a financing statement is sufficient to perfect a security interest, even if information in it is vague or ambiguous, so long as the information is not 'seriously misleading.' *See In re Waters*, 90 Bankr. 946, 960 (Bankr.N.D.Iowa 1988) ('key is whether a potential creditor would have been misled'); *In re King*, 30 Bankr. 2, 4 (Bankr.E.D.Tenn.1983) (even if some ambiguity existed, 'description was adequate to afford notice to interested parties that the Bank claimed a security interest in plaintiffs' computer equipment'); *In re Tri–State Equip.*, 792 F.2d at 972 ('even an imprecisely worded statement can be sufficient;' question is whether description is 'so "seriously misleading" * * * that it would simply stop future creditors from making the further inquiries they were obligated by the U.C.C. to make'); *In re McBee*, 714 F.2d at 1321 ('Perfect accuracy * * * is not required as long as the financing statement contains sufficient information to "put any searcher on inquiry." '). Only where the financing statement does not perform its notice function by reason of an inadequate, ambiguous or misleading description of the encumbered property will it be deemed insufficient to constitute perfection of the secured party's interest in the collateral. *See Thorp Commercial Corp.*, 654 F.2d at 1252 ('The financing statement would not provide notice where the description of collateral is misleading, for example, if the description were simply wrong or if the description seemingly would not cover the collateral but contained coverage under some hidden ambiguity that could not be considered reasonable notice.'); *In re Copper King Inn, Inc.*, 918 F.2d 1404, 1408 (9th Cir.1990) (financing statement insufficient where hypothetical creditor could have been led astray); *In re Katz*, 563 F.2d 766, 767 (5th Cir.1977) (where the language of financing statement would not have alerted subsequent potential secured party to need for additional inquiry concerning whether debtor's inventory was encumbered, prior secured party's interest in inventory was unperfected).

"These principles pertaining to U.C.C. financing statements are derived from application of specific U.C.C. provisions. The court in *In re Tri–State Equipment, Inc.*, 792 F.2d 967 (10th Cir.1986), was faced with a financing statement which, on its face, revealed three possible interpretations of what was described. The question was, therefore, 'what effect a financing statement has, when the language it uses has several distinct meanings.' *Id.* at 970. The answer to that question was found in these Code provisions:

"Section [9–402(1)] broadly commands that a financing statement 'is sufficient if it contains a statement *indicating the types,* or describing the items, of collateral' (emphasis added). Similarly, § [9–402(8)] provides that a financing statement 'substantially complying with requirements of this section is effective even though it contains minor errors which are not seriously misleading.' And § [9–110] states that 'any description of personal property [under this Article] is sufficient * * * whether or not it is specific if it reasonably identifies what is described.'

"*Id.* The court noted that these provisions evidenced the U.C.C.'s 'broad policy of lenity,' and went on to explain further:

"It was the stated intent of the drafters of the U.C.C. financing statement rule to create only a 'simple' system of 'notice filing,' with minimal formal requirements. See § [9–402] official comment, 1–2. Under the U.C.C. system, a proper financing statement will show 'merely that the secured party who has filed *may* have a security interest in the collateral described.' *Id.* official comment 2 (emphasis added). The drafters frankly acknowledged their expectation that, after a potential lender has encountered a financing statement, 'further inquiry * * * will be necessary to disclose the complete state of affairs.' *Id.*

"The burden is placed on later creditors to protect themselves by getting full information on any prior agreements flagged by the minimal financing statement filing.

"For these reasons, the settled rule * * * is that the description in the filing 'need only *put other creditors on notice of a possible security interest in the collateral* in question.' * * * Most other courts are also now willing to find a description that is unclear or susceptible to more than one distinct meaning sufficient in circumstances in which the description would put other creditors on notice of the need for further inquiry.

"*Id.* (quoting *Platte Valley Bank v. B. & J. Constru., Inc.,* 44 Colo.App. 21, 606 P.2d 455, 456 (Colo.App.1980) (additional citations omitted)). *See also Thorp Commercial Corp.,* 654 F.2d at 1249." (Footnotes and double quotation marks omitted.)

The court noted that the cases cited support the notion that a financing statement, though ambiguous, may nevertheless provide adequate notice to a prospective purchaser that further inquiry should be made to ascertain the extent of the collateral covered by a secured party's agreement with the debtor.

The court noted that the question was one of degree, *i.e.,* was the description so ambiguous that a party reading it might not reasonably comprehend that the property sought to be purchased or further encumbered is covered, or is the

ambiguity such as would prompt additional inquiry from the secured party to ascertain whether the property is subject to a preexisting security interest?

The court noted that a few courts have held that an ambiguous or vague description, in and of itself, will prevent perfection of a security interest, without reference to whether the description would alert third parties to the need for inquiry, but that this is a distinctly minority problem. *Id.*, 837 F.Supp. at 801.

We find that the trial court properly granted summary judgment in this matter. The facts are not in material dispute. The appellant was notified in February 1991 that FCS had loaned money to Helstern to plant the 1991 corn and bean crop. Appellant knew that Helstern had harvested that crop in the fall of 1991 and had sold it to appellant. Appellant also knew that it had already paid Helstern and FCS for the 1991 corn and bean crop it had purchased.

When appellant received a Notice of Security Interest in late November 1991 identical to the one it had been provided by appellee in February 1991, there were two possible explanations. One explanation was that the notice was a mistake, *i.e.*, it was a redundant notice for the 1991 harvested crop. The more logical explanation was that Helstern had borrowed money early from FCS for planting the 1992 crop.

In any event, it is undisputed that, after receiving the November 1991 notice that FCS claimed a lien on Helstern's "1991–1992" corn and bean crop, appellant made no further inquiry of FCS.

We agree with Judge Lee in *First Bank v. Eastern Livestock Co.*, 837 F.Supp. 792, that the settled rule is that the description in the filing need only put other creditors on notice of a possible security interest in the collateral in question. Once the appellant was notified that FCS had a possible security interest in Helstern's 1992 crop, it had a duty of further inquiry to disclose the complete state of affairs.

We do not believe that the notice given by FCS to appellant in November 1991 was so "seriously misleading" that it would simply stop appellant from making the further inquires that it was obligated by the UCC to make. *In re Tri-State Equip., Inc.* (C.A. 10, 1986), 792 F.2d 967.

We agree with the trial court that FCS's notice of security interest in Helstern's 1992 crop "substantially complied" with the requirements of Section 1631(e), Title 7, U.S.Code. See *Lisco State Bank v. McCombs Ranches, Inc.* (D.Neb.1990), 752 F.Supp. 329.

The appellant's assignments of error are overruled. The judgment of the trial court will be affirmed.

*Judgment affirmed.*

Grady and Frederick N. Young, JJ., concur.