**ITT COMMERCIAL FINANCE CORP., Plaintiff,**

**v.**

**BANK OF THE WEST, Defendant.**

**No. EP–94–CA–71–F.**

United States District Court,
W.D. Texas,
El Paso Division.

April 5, 1996.

Robert M, O'Boyle, Haynes and Boone, Austin, TX, Paula Seabaugh, St. Louis, MO, for plaintiff.

Victor M. Firth, James, Goldman & Haugland, P.C., El Paso, TX, for defendant.

## MEMORANDUM OPINION AND ORDER

FURGESON, District Judge.

In this Texas Uniform Commercial Code ("UCC") case, the ultimate question is whether a first creditor's failure to correctly hyphenate a debtor's corporate name defeats the creditor's priority position in relation to a later-filed financing statement by another creditor. The correct name of the debtor is Compu–Centro, USA, Inc. The first creditor, Bank of the West ("BOW"), filed its financing statement on the corporation under the name "Compucentro, USA, Inc.," omitting the hyphen. The second creditor, ITT Commercial Finance Corp. ("ITT"), filed its financing statement in the exact legal name of the corporation "Compu–Centro, USA, Inc.," and did not omit the hyphen. When conducting a search request for ITT, the Texas Secretary of State ("Secretary") did not find a previous existing creditor for Compu–Centro, USA, Inc. The debtor has now declared bankruptcy and this battle between the creditors has ensued.

Before the Court are the parties' Cross–Motions for Summary Judgment. In choosing between difficult alternatives, the Court grants Plaintiff ITT's Motion for Summary Judgment and denies Defendant BOW's Motion for Summary Judgment.

## I. PROCEDURAL HISTORY

ITT filed its Original Complaint on March 7, 1994, alleging: (1) breach of contract and (2) conversion. ITT also sought a declaratory judgment regarding certain secured interests. On March 25, 1994, BOW filed its Original Answer and also filed a counterclaim alleging the same causes of action and entitlement to declaratory judgment. ITT filed a Motion for Summary Judgment on September 6, 1994. BOW filed its own Motion for Summary Judgment on September 15, 1994.

## II. FACTS

The relevant facts are not in dispute. ITT and BOW are both commercial lenders. Over the course of several years, BOW (independently and via its predecessors in interest) and ITT loaned money to the same debtor, a fledgling microcomputer dealer initially known by the trade name "Compucentro USA" and subsequently incorporated as "Compu–Centro, USA, Inc." The genesis of these loans, and the subsequent efforts to secure them, involve relationships beginning in 1988 and ending in 1993.

### A. BOW's predecessors in interest extend credit to Carlos Chacon, sole proprietor of Compucentro, USA, and move to perfect their security interests.

In 1988, Coronado Bank extended an SBA-guaranteed loan to Carlos Chacon and received a security interest in a broad class of current and after-acquired property.[1] At that time, the debtor was operating under the trade name "Compucentro, USA," a sole proprietorship owned by Carlos Chacon. On August 22, 1988, Coronado Bank filed a financing statement with the Secretary designating the borrower as "Chacon, Carlos d/b/a Compucentro USA."[2]

As a successor institution to Coronado Bank, Texas National Bank also extended SBA-guaranteed financing to Carlos Chacon in 1990 and, similarly, received a security interest in a broad class of current and

---

1. Under the Texas UCC it is permissible to collateralize after-acquired assets of a debtor pursuant to a security agreement. TEX.BUS. & COM.CODE ANN. § 9.204 (Texas UCC) (Vernon 1991).

2. The 1988 Coronado financing statement lists the following as collateral:

All accounts receivable, inventory, and furniture, fixtures and equipment whether now owned of hereafter acquired together with all proceeds including general intangibles and rights to payment of any kind.

The 1990 Texas National Bank filing similarly collateralized a broad class of after-acquired property.

after-acquired property. On February 27, 1990, Texas National Bank filed its financing statement, listing the debtor as "Carlos R. Chacon and Lorena Chacon d/b/a Compucentro, USA." In the latter part of 1990, BOW arranged to purchase the existing secured loans from the FDIC, receiver for Coronado and Texas National.

### B. "Compucentro, USA," the sole proprietorship, incorporates as "Compu–Centro, USA, Inc."

On November 12, 1990, Carlos Chacon formed a corporation. under the name "Compu–Centro, USA, Inc." Chacon wrote to his creditors, including BOW, on November 13, 1990, to provide notice that he had incorporated his business. In the letter, Chacon indicated to BOW that he had incorporated under the name "Compucentro, USA, Inc." Chacon continued to send occasional correspondence to BOW using the letterhead of the old company which still listed the debtor's name as "Compucentro, USA" leaving out the hyphen and the "Inc." The debtor also continued using the old company name when writing checks.

### C. BOW files notice of assignment of the predecessor bank's security interests and itself offers financing to the new corporation.

When BOW purchased the Coronado and Texas National Bank loans from the FDIC, BOW refinanced the original debt. BOW also took over, by assignment, Coronado and Texas National Bank's existing security agreements. With respect to the formation of the new corporation, there was no release of the existing liens of the sole proprietorship. Compu–Centro, USA, Inc. assumed responsibility for Carlos Chacon's secured debt and acknowledged the continuing security interest.

On January 28, 1991, BOW filed notice of assignment of Coronado Bank's August 22, 1988, filing. In this filing, the name of the debtor was listed as "Chacon, Carlos d/b/a Compucentro, USA." Nearly a month and a half later, on March 11, 1991, BOW filed notice of assignment of Texas National Bank's February 27, 1990, filing. In this filing, the debtor designation was "Carlos R. Chacon and Lorena Chacon d/b/a Compucentro, USA."

BOW also chose to independently extend secured financing to the new corporation, and filed a broad lien financing statement on January 18, 1991. In this filing, BOW specified the name of the debtor as "Compucentro, USA, Inc.," leaving out the hyphen.

### D. ITT extends credit to Compu–Centro and moves to perfect its security interest.

On October 1, 1991, ITT agreed to extend a line of credit for inventory purchases to Compu–Centro, USA, Inc. The next day, Chacon, as the sole shareholder of Compu–Centro, USA, Inc. signed a personal guarantee in favor of ITT. On October 14, 1991, ITT filed a broad lien UCC–1 financing statement with the Secretary. The borrower was listed as "Compu–Centro, USA, Inc."

In the course of its credit review of the borrower, ITT obtained information suggesting that Compu–Centro, USA, Inc. began operations earlier than its November 1990 incorporation date under a different business structure and a different name. The information included a loan application indicating that the debtor had begun operations in 1986 and a credit report on Carlos Chacon which indicated that the corporation formerly operated under the trade name "Compucentro, USA." ITT also possessed financial statements of Carlos and Lorena Chacon and a dealer application form completed by Carlos Chacon, each of which listed a $68,000 liability for an SBA loan made by BOW. ITT, however, made no further investigation and did not obtain an official search under the name "Carlos Chacon" or the name "Compucentro, USA" or the name "Compucentro, USA, Inc."

On October 18, 1991, four days after filing its financing statement, ITT obtained an official search of the Secretary's records under the name "Compu–Centro, USA, Inc." ITT's filing was the only filing reflected in the records.

## E. ITT shuts down the line of credit offered to Compu–Centro, USA, Inc. and the dispute between ITT and BOW is joined.

While the parties dispute the exact date, at some point in 1992 or 1993 the relationship between ITT and Compu–Centro, USA, Inc. soured as the debtor began facing cash-flow problems. ITT refused to advance additional funds for purchases of inventory unless those funds were secured by an irrevocable letter of credit issued by an independent creditor. Compu–Centro, USA, Inc. formally defaulted on its obligations to ITT on June 4, 1993, owing a total of $117,795.14. Compu–Centro, USA, Inc. informed ITT that it could not meet its payment obligations because BOW was in control of its accounts receivable and would not advance the requisite funds. On the same day, ITT sent a fax to BOW opining that ITT had a prior secured lien and demanding that BOW cease and desist from converting the accounts receivable of Compu–Centro, USA, Inc. BOW wrote back one week later, arguing that BOW in fact had the prior secured lien. On June 24, 1993, ITT and BOW entered into a subordination agreement which resolved some of their competing claims. ITT filed this lawsuit in March 1994.

## III. ARGUMENTS

In its Motion for Summary Judgment, ITT argues that its security interest in the assets of Compu–Centro, USA, Inc. has priority as a matter of law over BOW's security interest. When Carlos Chacon incorporated his business as "Compu–Centro, USA, Inc.," the filings made by BOW's predecessors in interest under the name "Carlos Chacon" became seriously misleading. In order to keep its security interest perfected, BOW had to file under the correct legal name of the new debtor, "Compu–Centro, USA, Inc."

Because BOW did not file under the correct legal name of the new debtor when it incorporated, BOW's security interest was no longer perfected. ITT claims that the name which BOW used on the financing statement, "Compucentro, USA, Inc.," was a tradename of the debtor. Thus, the Texas Non Uniform Amendment renders this financing statement ineffective. Alternatively, ITT argues that the name "Compucentro, USA, Inc." was seriously misleading as to the debtor's exact legal name, "Compu–Centro, USA, Inc."

In response, BOW argues that when Chacon incorporated as "Compu–Centro, USA, Inc.," the assets of the sole proprietorship were transferred unencumbered to the new corporation. Thus, the original financing statements of Coronado and Texas National Bank filed under Carlos Chacon's name were still valid. BOW was not obligated to refile in the name of the transferee, namely the new corporation "Compu–Centro, USA, Inc." Rather, ITT was obligated to trace the source of the debtor's title to the collateral in question by searching under the names of the prior owners of the collateral, in this case under the name of "Carlos Chacon."

Even if the Court were to hold that a transfer of collateral did not occur in this case, BOW argues that it perfected its security interest by filing a new financing statement under what it thought was the new legal name of the debtor, "Compucentro, USA, Inc." "Compucentro, USA, Inc." was not a trade name of the debtor. Therefore, the Texas Non Uniform Amendment does not render a filing using that name invalid. Further, BOW claims that this new financing statement was not seriously misleading because the omission of the hyphen was a minor error. A prudent lien search by ITT should have included "Compucentro, USA," a name variation used frequently by the debtor.

## IV. STANDARD FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith" where the pleadings and evidence on file show that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). Rule 56 mandates the entry of summary judgment where the requirements of the rule are met. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The threshold inquiry in analyzing a motion for summary judgment is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The initial burden is on the party moving for summary judgment to demonstrate that there are no genuine factual issues. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. However, the movant need not negate the elements of the nonmovant's case. It is sufficient that the movant point to an absence of evidence to support the nonmovant's case. If the movant fails to carry this opening burden, summary judgment is not appropriate, regardless of the nonmovant's response. *Id.*

If, however, the movant meets the initial required showing, the burden then shifts to the nonmovant to "come forward with evidence establishing each of the challenged elements of its case for which the nonmovant will bear the burden of proof at trial." *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.) (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548), *cert. denied,* 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). The nonmovant may satisfy this burden only through competent evidence, such as depositions or affidavits. *Topalian,* 954 F.2d at 1131. Mere conclusory allegations will neither defeat nor support a motion for summary judgment. *Id.*

Factual controversies must be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994). It is not appropriate for a court to assume that the nonmoving party could or would prove necessary facts, in the absence of actual proof of those facts. *Id.* If the nonmovant fails to meet this burden of proof, and there is no genuine controversy of fact, summary judgment must be rendered.

Here, both parties have moved for summary judgment. This circumstance alone does not render a trial unnecessary, nor does it mean that no fact issues exist. 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 2720 (2d. ed. 1983 & Supp. 1994). Rather, the Motion of each party must be considered independently. *Id.*

## V. DISCUSSION

### A. Breach of contract cause of action

Since the date that these Motions were filed, the parties have reached an agreement as to liability and damages due under a subordination agreement, and have agreed to a Rule 68 Offer of Judgment. This agreement was entered as an interlocutory judgment by the Clerk of the Court on December 19, 1994. By this same agreement, it remains for the Court to determine ITT's court costs and attorney's fees pursuant to the subordination agreement.

### B. Conversion and declaratory judgment causes of action

The question which remains in this diversity action is one of interpretation of the Texas UCC. The parties are creditors of the same debtor. Each creditor claims a perfected security interest in the same collateral. To resolve this dispute, the Court must determine if the creditors are perfected under Texas law and, if so, which one has priority. The Court would not be free to decide the question if there

were a Texas case on point, given the rule under *Erie* to follow state law in diversity cases. *Cosden Oil & Chemical Co. v. Karl O. Helm Aktiengesellschaft,* 736 F.2d 1064, 1069 (5th Cir.1984). No Texas case, however, has definitively addressed this question.

The resolution of this dispute involves a five step analysis which traces the impact of the debtor's incorporation in November 1990 and BOW's subsequent refilings in January and March 1991. The five questions discussed in order are:

1. Were the original security agreements signed in 1988 and 1990 in favor of Coronado and Texas National invalidated by the debtor's incorporation?

2. When Carlos Chacon incorporated as Compu–Centro, USA, Inc. was the relevant collateral transferred to the new corporation?

3. Did the change in the name of the debtor from "Carlos Chacon" to "Compu–Centro, USA, Inc." mean that BOW had to file a new financing statement (i.e. did the name change render the original 1988 and 1990 financing statements seriously misleading)?

4. Was BOW's January 18, 1991, financing statement filed under the name "Compucentro, USA, Inc." rendered ineffective by the Texas Non Uniform Amendment?

5. Was BOW's January 18, 1991, filing under the name "Compucentro, USA, Inc." seriously misleading?

**1. Were the original security agreements signed in 1988 and 1990 in favor of Coronado and Texas National invalidated by the debtor's incorporation?**

In 1988 and 1990, Carlos Chacon signed security agreements with both of BOW's predecessors in interest. The agreements gave both banks a security interest in the debtor's then existing inventory, accounts receivable, furniture, fixtures and equipment, and also a security interest in any future such property the debtor should come to possess. When BOW acquired the loans made by Coronado and Texas National Bank, it acquired a security interest in the debtor's after acquired property. This security interest was in the after acquired property of the old debtor, Carlos Chacon, not the new debtor, Compu–Centro, USA, Inc.

■ At the time of the debtor's incorporation, however, BOW did not authorize the new corporation to take ownership of the assets free and clear of the existing security interests. The change in the debtor's organizational structure from sole proprietorship to corporation was subject to the corporation's assumption of the secured debt and the continuation of the existing security interests. Accordingly, the 1988 and 1990 security agreements made by Carlos Chacon in favor of Coronado and Texas National Bank are not invalid as against the assets of Compu–Centro, USA, Inc. BOW, therefore, has a security interest in the after acquired property of Compu–Centro, USA, Inc.

**2. When Carlos Chacon incorporated as Compu–Centro, USA, Inc. was the relevant collateral transferred to the new corporation?**

BOW argues that when Carlos Chacon incorporated his business, the assets which he owned were transferred to Compu–Centro, USA, Inc. If this is true, BOW would not be required to file an amended financing statement. Rather, the burden would fall to the subsequent secured creditor, ITT, to search Compu–Centro, USA, Inc.'s chain of title in order to discover BOW's security interest. ITT denies that the collateral at issue in this case was transferred.

■ Controlling law on this issue is found in section 9.402(g) of the Texas UCC, which corresponds to 9–402(7) of the UCC. For ease of analysis, it is best to consider this provision sentence by sentence:

**First Sentence:** A financing statement sufficiently shows the name of the debtor if it gives the individual, partnership or corporate name of the debtor, whether or not it adds other trade names or the names of partners.

**Texas Non Uniform Amendment (Second Sentence):** Filing under a trade name or assumed name alone shall not be sufficient to perfect a security interest unless the trade name or assumed name is so similar to the debtor's legal name that the trade name or assumed name filing would be discovered in a search of the filing officer's records pursuant to Subsection (b) of Section 9.407, conducted in response to a request using the legal name of the debtor.

**Third Sentence:** Where the debtor so changes his name or in the case of an organization its name, identity or corporate structure that a filed financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than four months after the change, unless a new appropriate financing statement is filed before the expiration of that time.

**Fourth Sentence:** A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer.

TEX.BUS. & COM.CODE ANN. § 9.402 (Tex. UCC) (Vernon 1991) (denotations of sentence added). BOW takes the position that the fourth sentence of 9.402(g) applies in this case. This sentence covers all transfers of collateral, whether from the debtor to an unrelated party or, as in this case, from the debtor to itself via a change in form of business organization. *In re Scott,* 113 B.R. 516, 520 (Bankr.W.D.Ark. 1990); Gregory Morical, *An Organizational Approach to Resolving the Attachment and Perfection Problems of Identity Changes Under § 9–203(1)(A) and § 9–402(7) of the Uniform Commercial Code,* 28 IND.L.REV. 43, 52–53 (1994).

To resolve the question regarding transfer of collateral, the Court first classifies that collateral into three separate categories based upon the date it became the property of the debtor. Category One is collateral owned by Carlos Chacon on November 12, 1991, the date of incorporation. Category Two is collateral acquired by the new corporation between November 12, 1990 and March 12, 1991, the four month period following the incorporation. Category Three is collateral acquired by the new corporation after March 12, 1990.

From the facts, it is clear that Category One collateral owned by Carlos Chacon on the day of incorporation automatically transferred to Compu–Centro, USA, Inc. Thus, the fourth sentence of 9.402(g) governs this type of property. The original financing statements continued to perfect BOW's security interest in that property, even though the debtor's name and form had changed.

Property acquired by Compu–Centro, USA, Inc. between November 12, 1990, and March 12, 1991, Category Two collateral, is governed by the third sentence of 9.402(g). This property could not have been transferred from the old debtor to the new debtor because the old debtor no longer existed. Hence, the fourth sentence of 9.402(g) does not apply. The UCC, however, provides a four month period during which time the old financing statement against the old debtor still perfects the security interest in property acquired by the new debtor. Accordingly, the original financing statements continued to perfect BOW's security interest in property acquired by Compu–Centro, USA, Inc. between November 12, 1990, and March 12, 1991.

█ Category Three collateral, property acquired by Compu–Centro, USA, Inc., after March 12, 1991, is also governed by the third sentence of 9.402(g). This property cannot be said to have been transferred from the old debtor to the new debtor either. Again, the fourth sentence of

9.402(g) does not apply. More importantly, when the four month period ended, the old financing statements no longer perfected BOW's security interest, unless the financing statement was not seriously misleading as to the new name of the debtor, which is discussed *infra*. There is no dispute in this case that the accounts receivable at issue were generated from sales of inventory which were acquired by Compu–Centro, USA, Inc. after March 12, 1991.

BOW cited the Court to the case of *In re Southern Properties Inc.* in support of its argument that Carlos Chacon transferred the collateral to Compu–Centro, USA, Inc. 44 B.R. 838 (Bankr.E.D.Va. 1984). In *Southern Properties,* the original debtor, an individual, transferred restaurant equipment subject to a security agreement to a subsequent debtor, a company. *Id.* at 841. The creditor did not file an amended financing statement, but the court held that the creditor did not need to do so to keep its security interest perfected. *Id.*

BOW's reliance on *Southern Properties* is misplaced because the collateral in that case was owned by the old debtor before the transfer of the equipment took place. *Id.* By contrast, the collateral in this case was acquired by the new debtor more than four months after the old debtor ceased to exist. While BOW's security interest in Carlos Chacon's inventory and accounts receivable continued in Compu–Centro, USA, Inc., as discussed above, the original financing statements did not automatically continue to perfect that interest.

While some collateral was transferred when Carlos Chacon incorporated as Compu–Centro, USA, Inc., the collateral in dispute in this case was not transferred. For that reason, the third sentence of 9.402(g), not the fourth, controls this case. The Court must, therefore, determine whether the financing statements perfecting BOW's security interests were still effective as a result of the debtor's name change and incorporation.

**3. Did the change in the name of the debtor from "Carlos Chacon" to "Compu–Centro, USA, Inc." mean that BOW had to file a new financing statement (i.e. did the name change render the original 1988 and 1990 financing statements seriously misleading)?**

With respect to accounts receivable and inventory acquired by Compu–Centro, USA, Inc. after March 12, 1991, the requirements for perfection fall within the ambit of the third sentence of 9.402(g). If the name change rendered the original financing statement seriously misleading, BOW had to file a new one under the new name of the debtor. If BOW did not do this within four months of the name change, those security interests would no longer be perfected.

### a. An Issue of Fact or Law?

As an initial matter, the Court must first determine its ability to rule upon whether a particular financing statement is seriously misleading as a matter of law. There is a considerable amount of confusion on this issue which is illustrated, or perhaps caused, by a split in the relevant case law. Several courts have suggested that this question is ordinarily one of fact. *In re Glasco, Inc.,* 642 F.2d 793, 796 (5th Cir. Unit B 1981); *In re Darling Lumber, Inc.,* 56 B.R. 669, 673 (Bankr.E.D.Mich.1986). *See also In re West Coast Food Sales, Inc.,* 637 F.2d 707, 709 (9th Cir.1981) (remanding determination of whether filing was seriously misleading to bankruptcy court as "factual inquiry."). Others have held that it is a question of law. *First Bank v. Eastern Livestock Co.,* 837 F.Supp. 792, 801 (1993); *Citizens Nat. Bank of Evansville v. Wedel,* 489 N.E.2d 1203, 1206 (Ind. Ct.App.1986); *First Agri Servs., Inc. v. Kahl,* 129 Wis.2d 464, 385 N.W.2d 191, 194 (App.1986).

The term "fact question" is typically used to denote a question to be resolved by the trier of fact, as opposed to a question of law. BLACK'S LAW DICTIONARY 533

(5th ed. 1979) ("Fact questions are for the jury, unless the issues are presented at a bench trial, while law questions are decided by the judge."). Further analysis indicates, though, that in the context of whether or not a financing statement is seriously misleading, a "factual question" means something different. Rather than being an issue decided by the fact finder, the seriously misleading issue is a question of law for the court to decide based upon the individual facts of the case. *First Bank*, 837 F.Supp. at 801 (deciding motion for summary judgment submitted on "seriously misleading" question). *See also Citizens Nat. Bank*, 489 N.E.2d at 1206; *First Agri Servs.*, 385 N.W.2d at 194.

The Fifth Circuit adopted this same interpretation in *In re Hammons*. 614 F.2d 399, 402–03 (5th Cir.1980). The court noted that the trier of fact "sees and hears witnesses, makes credibility determinations, and resolves conflicts in the proof." *Id.* The district court must then independently make the ultimate legal conclusions on the basis of the facts found. As applicable to the circumstances of *Hammons*, the bankruptcy court made a factual determination that the financing statement at issue listed one of the individuals legally responsible for the debt. Based upon this fact, the Fifth Circuit held that the financing statement perfected the creditor's security interest as a matter of law. *Id.* at 406.

The Court, therefore, can resolve whether the financing statements in dispute were seriously misleading based upon the facts of this case.

### b. The Effectiveness of the Old Financing Statements

In evaluating the legal effect of the debtor's 1990 incorporation upon BOW's 1988 and 1990 security agreements with the old debtor, it is important to distinguish the effect on the security interests from the effect on the financing statements which perfected those interests. *Scott*, 113 B.R. at 520 ("Whether or not a financing statement is misleading so as to render a filing ineffective would appear to be legally irrelevant if there is no underlying security interest to perfect."). *See also West Coast Food Sales* 637 F.2d at 709; Morical, *An Organizational Approach* at 52. Simply because BOW's security interest in the after acquired property of the new debtor continues unaffected does not mean that the financing statement perfecting that interest continues.

■ Texas courts have held that a financing statement is not seriously misleading if "a reasonably prudent subsequent creditor would have discovered the prior security interest." *Continental Credit Corp. v. Wolfe City Nat'l Bank*, 823 S.W.2d 687, 688–89 (Tex.App.—Dallas 1991, no writ) (citing *In re Lane*, 41 B.R. 285, 288 (Bankr.N.D.Tex.1984). For obvious reasons, there has been little argument in this case as to the effectiveness of the 1988 and 1990 financing statements filed by Coronado and Texas National Bank. The Court recognizes the "obvious futility" of discovering a financing statement which lists the debtor as an individual under the name "Carlos Chacon" being retrieved in a search of a corporation under the name "Compu–Centro, USA, Inc." *Continental Credit*, 823 S.W.2d at 691 (noting the obvious futility of discovering a financing statement filed under the individual name "Summers" while searching for the corporate name "Pawn Partners, Inc.") The Court concludes that these 1988 and 1990 filings became seriously misleading when the debtor changed its actual name to "Compu–Centro, USA, Inc."

Additionally, BOW's filings reflecting the assignment of the loans from Coronado and Texas National were also seriously misleading as a matter of law. 9.402(g) allowed BOW four months from the date of Compu–Centro, USA, Inc.'s incorporation to file a new financing statement under the new name. Tex.Bus. & Com.Code Ann. § 9.402(g) (Tex.UCC) (Vernon 1991). BOW filed two notices of assignment, one on January 28, 1991, for the Coronado loan

and the other on March 11, 1991, for the Texas National loan, which reflected the assignment of those loans to BOW. The two new filings, however, listed the old name of the debtor: "Chacon Carlos d/b/a Compucentro, USA" and "Carlos R. Chacon and Lorena Chacon d/b/a Compucentro, USA." For the reasons discussed above, these filings were also seriously misleading as to the name "Compu–Centro, USA, Inc." and did not perfect BOW's security interest.

**4. Was BOW's January 1991 financing statement filed under the name "Compucentro USA Inc." rendered ineffective by the Texas Non Uniform Amendment?**

BOW also filed a financing statement on January 18, 1991, pursuant to the supplemental financing it extended to Compu–Centro, USA, Inc., in January 1991. The financing statement listed the debtor's name as "Compucentro, USA, Inc." omitting the hyphen in the first word. The debtor often used the name "Compucentro, USA," as a trade name both before and after incorporation. For this reason, ITT claims that the Texas Non Uniform Amendment invalidates this financing statement because it only lists the debtor's trade name. TEX.BUS. & COM.CODE ANN. § 9.402 (Tex.UCC) (Vernon 1991).

The nature and effect of the Texas Non Uniform Amendment is best understood by examining the case which it overrules, *In re McBee*. 714 F.2d 1316 (1983). *McBee* resolved the competing secured claims of creditors of a sole proprietorship. The first creditor had filed a financing statement listing only the trade name of the sole proprietorship, "Oak Hill Gun Shop," and not the actual name of the sole proprietor. *Id.* at 1318. One issue the court determined was whether this filing perfected a security interest. The lower court had held that use of a trade name, instead of the name of the sole proprietor, was "seriously misleading," within Section 9.402(g). The Fifth Circuit took a different view. Believing a more forgiving atti-

tude to underlie the UCC, the Court of Appeals held that the first creditor's filing perfected its security interest. *Id.* at 1325.

In 1989, the Texas legislature voiced its disapproval of this result by amending Section 9.402(g), adding a sentence now known as the Texas Non Uniform Amendment. The legislative history explicitly states that the purpose of the amendment is to overrule *McBee*. Bill Analysis, S.B. 139, Committee on Business Commerce. As its juxtaposition with *McBee* demonstrates, the amendment is meant to address a specific factual scenario in which the creditor chooses between the actual name or the trade name of the debtor when filing a financing statement. *See* TEX.BUS. & COM.CODE ANN. § 9.402 (Tex. UCC) (Vernon 1991). The amendment operates to invalidate a filing made solely in the trade name of the debtor while omitting the actual name of the debtor, unless an official search made under the trade name would reveal the prior filings.

The text of the Texas Non Uniform Amendment and the legislative history of the statute prove this point. The amendment itself notably contains the word "alone." *Id.* This language presumes the choice between actual name and trade name. The Bill Analysis points in the same direction:

It is believed that the drafters of the Uniform Commercial Code intended that a party considering acquiring an interest in property should be able to protect itself by requesting a search only under the actual name of the Debtor, and that the party should not be required to search any and all trade names or aliases of the owner (or person in possession) of the property in order to protect itself from unknown liens or other claims of ownership. Therefore it is believed that the drafters of the UCC intended that filing under a trade name or alias would be permitted as an unnecessary precaution, but that filing under a trade name or alias is not intended to

properly perfect an interest in personal property or fixtures.

Bill Analysis, S.B. 139, Committee on Business & Commerce. *See also*, Julianna J. Zekan, *The New Game—Playing to Win Under § 9–402 of the Uniform Commercial Code*, 19 HOFSTRA L.REV. 365, 404–05 (1990) ("The Texas modification requires a trade name filing to withstand vigorous review....").

■ The Texas Non Uniform Amendment, however, does not apply to the facts presented here. The financing statement which BOW filed on January 18, 1991, listed the name of the debtor as "Compucentro, USA, Inc." BOW's designation of the debtor as "Compucentro, USA, Inc." instead of "Compu–Centro, USA, Inc.," was not an improper filing under a trade name of the debtor. Rather, it was an improper spelling of the actual name of the debtor. The fact that BOW's filing includes the term "Inc." confirms this point. "Compucentro, USA, Inc." was never a trade name of the debtor. The mere fact that the actual and trade names of the debtor are nearly identical does not justify application of the Texas Non Uniform Amendment.

■ Further, the amendment does not invalidate every filing which uses a trade name. It applies only where trade name designations are made at the exclusion of the actual name of the debtor. Moreover, the amendment did not destroy the seriously misleading standard with respect to other filings. Indeed, if the actual and trade names of the debtor were so similar that an official search under the actual name of the debtor revealed a financing statement under the trade name of the debtor, the filing would be effective. TEX. BUS. & COM.CODE ANN. § 9.402 (Tex.UCC) (Vernon 1991).

Therefore, the Court concludes that the Texas Non Uniform Amendment does not invalidate BOW's financing statement filed January 18, 1991, under the name "Compucentro, USA, Inc."

## 5. Was BOW's January 18, 1991 filing under the name "Compucentro, USA, Inc." seriously misleading?

It remains, therefore, for the Court to determine whether BOW's filing under the name "Compucentro, USA, Inc." was seriously misleading given that "Compu–Centro, USA, Inc." was the actual name of the debtor. Because the decision in this case rests upon such a technical detail that might otherwise appear insignificant, it behooves the Court to explain a number of changes in the Article 9 filing system generally, and particularly in Texas.

### a. The Article 9 Filing System

The Article 9 notice filing system "governs virtually all transactions secured by an interest in private property given through the consent of the debtor to the secured party." Zekan, *The New Game* at 366. Millions of filings are made each year to perfect security interests and millions of lien searches are conducted to identify any security interests in a prospective debtor's collateral. Edward S. Adams, Steve H. Nickles, Susan Sande, William R. Shiefelbein, *A Revised Filing System: Recommendations and Innovations*, 79 MINN.L.REV. 877, 878–79, (1995). In order to maintain the enforceability of a claim against a subsequent creditor, a secured party usually must file a financing statement which is deemed to put all subsequent creditors on notice, regardless of their actual knowledge of the security interest. A properly completed financing statement "is the key to the entire notice filing system upon which Article 9 relies because it provides the link between subsequent creditors and existing secured parties who have given value to the debtor." Zekan, *The New Game* at 366.

The drafters of Article 9 "based the filing system on the all-paper manual information technology of the time." Adams et al., *A Revised Filing System* at 889. Similarly in Texas, lien searches were conducted manually by employees of the Secretary when the Article 9 filing system was

first implemented. According to the deposition testimony of Wallis R. Boggus, associate deputy assistant for the Secretary for statutory filings, debtors in a manual filing system were indexed alphabetically in an index book. When a prospective creditor requested a certificate listing the financing statements on file against a particular debtor, the clerk manually searched through the index book of all financing statements on file, much as one would look through a telephone book to find somebody's phone number. Because the process was done manually, the searcher could retrieve financing statements which exactly matched the requested search name, and also those financing statements which, while not exact matches, were similar to the requested search name and, therefore, quite close to it in the index. The clerk then would list all those filings retrieved by the search on the certificate.

As computer technology has advanced, human involvement in conducting lien searches has become less and less the norm. *Id.* at 891. With the volume of financing statements now overloading state filing systems, most have begun computerization of their filing data. *Id.* at 889–90. As of April 1995, thirty-seven states had adopted some type of computerized filing system, and four more were in the process of doing so. *Id.* The move towards the automization of Article 9 filing systems has brought with it a corresponding increase in the need for precision in listing the name of a debtor on a financing statement. *In Re Waters,* 90 B.R. 946, 960 (Bankr. N.D.Iowa 1988). The greater degree of specificity is now necessary because the programming software used to search and recognize data "typically searches only for exact matches between information provided by the search request and that on the financing statement." Adams et al., *A Revised Filing System* at 891.

Likewise in Texas, the Secretary fully converted its Article 9 filing records from a manual system to an automated system in 1972, although the manual system is still used in roughly 95% of the county clerks offices in Texas. According to Boggus' deposition testimony, when a financing statement is now entered into the Secretary's automated system, the debtor's name is placed randomly onto a hard disk. The computer decides the most efficient and effective place to locate a particular debtor's information. When a search is requested, the system will retrieve each filing relating to that particular debtor's name, regardless of its position on the hard disk. Because it is looking for an exact match, though, it does not retrieve filings which approximate the name of the particular debtor in the same way as a manual searcher who reviews listings in an index book.

The computer software currently used by the Secretary to conduct searches, and used by the Secretary during the period relevant to this case, has some built in mechanisms to retrieve filings which may not match, but are similar to, the name of the requested debtor. Based upon a given logic, the system will retrieve a financing statement matching two or three words in the name of the requested search. It does not, however, retrieve similar prefixes, suffixes, or alternate spellings of a debtor name.

More pertinent to this case, when the Secretary's system performs a search for a hyphenated word, the searching program ignores the hyphen and leaves a space in its place. As a result, the system treats a hyphenated name as two separate words. It will not retrieve an unhyphenated word even though the letters are exactly the same because the unhyphenated word on file does not have a space where the system would otherwise expect one to be. For that reason, when ITT requested a certificate of financing statements filed against its debtor, "Compu–Centro, USA, Inc.," in October 1991, the system searched for two separate words: "Compu" and "Centro." The search did not reveal the financing statement filed on

January 18, 1991, by BOW under the name "Compucentro, USA, Inc." [3]

### b. The 9.402(h) Standard

Simply because BOW's January 18, 1991, filing listed the debtor's name incorrectly does not make the financing statement per se invalid. Texas UCC 9.402(h), which corresponds to 9–402(8) of the UCC, operates as a savings clause for financing statements which are not exactly correct. The provision states:

A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading.

TEX.BUS. & COM.CODE ANN. § 9.402(h) (Tex. UCC) (Vernon 1991). The statute redeems those statements which are defective but are otherwise legally sufficient to put a subsequent creditor on notice.

■ There are two significant, but necessarily conflicting policy interests which the Court must consider when interpreting 9.402(h). On the one hand, a secured creditor need not be absolutely precise when listing its debtor's name on a financing statement in order to perfect a security interest. Rather, the legal sufficiency of a financing statement should be measured by whether it provides effective notice. "Section 9–402(8) directs courts not to use technical grounds to invalidate a financing statement that otherwise meets the objectives of notice filing." Zekan, *The New Game* at 376. Indeed, the drafters of the UCC included this clause so that courts would not use extraordinarily technical grounds to invalidate a financing statement. *Id.* at 375–76 (noting commercial lender reactions to the pre-code decision in *General Motors Acceptance Corp. v. Haley*

which invalidated a financing statement solely because it omitted "Inc." from the name of the debtor. 329 Mass. 559, 109 N.E.2d 143 (1952)).

On the other hand, the Article 9 notice filing rests upon an accurate listing of a debtor's name in the financing statement. The filing officer uses the debtor's name as it is listed on the financing statement to create an index which subsequent creditors use to discover any potential liens against their debtor. If the debtor's name is listed incorrectly, the index is inaccurate and the ability of a searching party to locate the financing statement is jeopardized. JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 22–14, at 794 (4th ed.1995). Whereas mistakes in describing the collateral, listing the debtor's address or obtaining its signature can usually be rectified through further inquiry once the financing statement is discovered, there is much less room for error when listing the debtor's name because "such errors may prevent a searcher from discovering the financing statement" in the first place. *In re Wardcorp, Inc.*, 133 B.R. 210, 215 (Bankr.S.D.Ind.1990). "Absent discovery of the financing statement, notice of the security interest that may exist in the collateral is impossible." Zekan, *The Name Game* at 436.

Given these two contrasting policy objectives, finding a workable definition for the terms "substantial compliance" and "seriously misleading" as included in Section 9.402(g) has become one of the most discussed and most confusing Article 9 issues. A lack of consensus "on evaluating the error and imposing burdens" has lead to many and varied definitions of the terms. Zekan, *The New Game* at 375–76.

---

**3.** According to Boggus, when the Secretary makes an entry in the individual index under the individual's name, it also makes an entry in the corporate index under a trade name if one is noted on the financing statement. BOW's original and amended financing statements which listed the debtor individually as "Carlos Chacon" also indicated that Chacon was doing business under the name "Compucentro, USA." Thus, four financing statements were filed under the name "Compucentro, USA." For the same reasons that ITT's search request did not recover the financing statement under the name "Compucentro, USA, Inc.," the request did not recover any financing statements filed under the name "Compucentro, USA" either.

Articulating a standard for 9.402(h) "is further complicated by the tautological nature" of the section's language:

> Substantial compliance appears synonymous with errors that are not seriously misleading. If the error is seriously misleading, there can be no substantial compliance. If the error is minor, the financing statement substantially complies with Code requirements. But an error that appears to be minor may be seriously misleading and the financing statement therefore would not substantially comply with Code requirements.

*Id.* at 377.

■ As noted above, a filing is legally sufficient in Texas if a "reasonably prudent creditor" would have discovered the financing statement. *Continental Credit*, 823 S.W.2d at 688–89. This standard may be instructive when the name on the disputed financing statement is entirely different from the debtor's exact name (i.e. "Chacon, Carlos" or "Carlos R. Chacon and Lorena Chacon" vis a vis "Compu-Centro, USA, Inc." discussed above). It is less helpful when the error appears to be minor and the names are quite similar (i.e. "Compucentro, USA" or "Compucentro, USA, Inc." vis a vis "Compu-Centro, USA, Inc.").

■ Having examined both cases and commentaries on the subject, the Court believes that for a financing statement to be legally sufficient under the Texas UCC it must be recoverable through a search under the exact legal name of the debtor under the system employed by the Secretary to conduct that search. Zekan, *The Name Game* at 376. This is not a subjective analysis as to the similarity between the debtor's exact name and the name as it is appears on the disputed financing statement. Rather, the issue is whether a search by the Secretary of the index would reveal the financing statement to the subsequent creditor. *In re Terry Pierson, Inc.*, 84 B.R. 533, 535 (Bankr.S.D.Ill.1988); Zekan, *The Name Game* at 423–25. Substantial compliance requires the financing statement "provide enough information to alert an interested party of a possible prior security interest." Zekan, *The Name Game* at 425 (citing *Pierson*, 84 B.R. at 535).

The standard adopted by the Court concurs with the recent suggestions of a drafting committee of the National Conference of Commissioners on Uniform State Laws and the American Law Institute. The discussion draft on proposed changes to Article 9 recommends that an additional sentence be added to 9–402(8) to further define the term seriously misleading as follows:

> A financing statement that does not sufficiently give the name of the debtor is seriously misleading unless the filing office would discover the financing statement in a search of its records conducted ... in response to a request using the debtor's correct name, in which case the insufficiency of the debtor's name does not render the financing statement seriously misleading.

UNIFORM COMMERCIAL CODE REVISED ARTICLE 9. SECURED TRANSACTIONS; SALES OF ACCOUNTS AND CHATTEL PAPER, § 9–402(h) (Tentative Draft 1996). The Court acknowledges that this proposed statutory language may not be used to ascertain the actual legislative meaning of Section 9.402(h), but notes, approvingly, that the proposed language conclusively resolves the policy dispute that has clouded the definition of seriously misleading.

If a search request in the correct legal name of the debtor reveals the disputed financing statement, the financing statement substantially complies with the requirements of 9.402(h). If a search request in the correct legal name of the debtor does not reveal the disputed financing statement, however, the financing statement does not substantially comply with 9.402(h). This result must hold regardless of how similar the debtor's actual name is to the name as it appears on the disputed financing statement. If the dis-

puted financing statement cannot be discovered through the search, any information on the disputed financing statement would provide no notice of the first secured creditor's interest in the collateral. *Pierson*, 84 B.R. at 536.

### c. The Omission of the Hyphen

BOW argues that the omission of the hyphen is a minor error and that ITT should still have been alerted to BOW's security interest. The omission, on its face, may be less confusing than other omissions or additions to financing statements that other courts have not found to be seriously misleading. *In re Excel Stores, Inc.*, 341 F.2d 961 (2d Cir.1965) (debtor listed as "Excel Department Stores" instead of under exact name "Excel Stores, Inc."); *In re Southern Supply Co.*, 405 F.Supp. 20 (E.D.N.C.1975) (debtor listed as "Southern Supply Co." instead of under exact name "Southern Supply Co. of Greenville, N.C., Inc."); *In re Paramount Int'l Inc.*, 154 B.R. 712 (Bankr. N.D.Ill. 1993) (debtor listed as "Paramount Attractions Inc." instead of under exact name "Paramount International Inc."); *In re Nara Non Food Distributing, Inc.*, 66 Misc.2d 779, 322 N.Y.S.2d 194 (1970), *aff'd*, 36 A.D.2d 796, 320 N.Y.S.2d 1014 (1971) (debtor listed as "Nara Dist. Inc." instead of under exact name "Nara Non Food Distributing Inc."); *Sales Fin. Corp. v. McDermott Appliance Co.*, 340 Mass. 493, 165 N.E.2d 119 (1960) (debtor listed as "McDermott Appliance Co., Inc." instead of under exact name "McDermott Appliance Company, Inc.").

Merely comparing the similarity between the disputed names may have been an effective standard when the searching was done manually. The computerization of the Secretary's Article 9 filing system, though, has changed that.

The presumptions of discovery and recognition inherent in the ... (name similarity) approach are not valid given today's volume of filings nor are they valid in computerized systems. The mere fact that the searcher ... would have noticed the similarity suggests more than mere observation. It presumes discovery, for without discovery there could be no comparison.

Zekan, *The New Game* at 414. BOW's January 18, 1991, financing statement needed to be discovered by the Secretary's computer search under the name "Compu–Centro, USA, Inc." in order for BOW's security interest to be perfected. *Compare Wardcorp*, 133 B.R. at 211 (creditor's financing statement did not perfect its security interest because a search under debtor's exact name, "Wardcorp, Inc.," would not necessarily recover filings under the name used by the creditor, "Ward Corporation, Inc.") *with Darling Lumber*, 56 B.R. at 674 (creditor's financing statement did perfect its security interest because a search under debtor's exact name, "Darling Lumber, Inc.," recovered the filings under the incorrect name used by the creditor, "Keeling, John A. and Vicki L., dba Darling Lumber Co.")

█ If BOW's financing statement had been discovered by ITT's search request, the Court would undoubtedly have concluded that ITT had been put on notice regarding BOW's security interest. Based upon the similarity of the names, addresses and the identical debtor signatures, BOW's financing statement could not have been considered seriously misleading had it been discovered by the search. It is undisputed, though, that ITT's search request through the Secretary's filing system under the name "Compu–Centro, USA, Inc." did not recover BOW's January 18, 1991, financing statement listing the debtor's name as "Compucentro, USA, Inc." ITT could not compare the similarities between the debtor names because it could not have been informed of BOW's security interest through the Secretary's filing system.

Consequently, BOW's financing statement does not substantially comply with the requirements of Texas UCC 9.402. The financing statement does not perfect

BOW's security interest in the debtor's collateral and, as a result, BOW's security interest became unperfected on March 12, 1991, four months after the debtor's incorporation.[4] ITT has first position and is entitled to judgment in the amount of $117,795.14.

■ BOW maintains that ITT, as a prudent creditor, should have searched under both "Compucentro, USA" and "Compucentro, USA, Inc." in addition to "Compu–Centro, USA, Inc." The Court rejects this argument. In Texas, ITT's obligation as a reasonably prudent creditor is to request a computer search from the Secretary only under the legal name of the borrower. ITT is not required to search under the name of the former proprietor before the debtor became a corporation. ITT is not required to search under any conceivable misspellings of the actual name. ITT is not required to search through a private search company, distinct from the Secretary's office, because of any perceived inadequacies in the recovery capability of the Secretary's filing system. See Wardcorp, 133 B.R. at 215 ("Any rule that would burden a searcher with guessing misspellings and misconfigurations of a legal name or that would make a searcher dependent on the discretion of the clerk conducting the search would not provide creditors with the certainty that is essential in ... commercial transactions.") Moreover, as the Texas Legislature has made quite clear, ITT is not required to search under any possible trade names of the debtor. TEX.BUS. & COM.CODE ANN. § 9.402(g) (Texas UCC) (Vernon 1991). Requiring a subsequent creditor to perform any of the aforementioned searches in addition to a search under the debtor's exact legal name, as BOW suggests, would thoroughly frustrate the operation of the Article 9 filing system.

■ BOW also claims that ITT had actual knowledge of BOW's January 18, 1991, financing statement. Armed with that knowledge, ITT did not act in a commercially reasonable or prudent manner because it ignored BOW's filings. The Court rejects this argument as well. Whether ITT had actual knowledge of BOW's financing statement is irrelevant to the issue of perfection. First Bank, 837 F.Supp. at 803.[5] The code manifests a strict policy of relying solely upon proper filing to settle questions of perfection. This avoids the vagaries of determining factual issues of knowledge. Greg Restaurant Equip. & Supplies v. Valway, 144 Vt. 59, 472 A.2d 1241, 1244 (1984). Indeed, the Article 9 filing system removes any determination of actual knowledge from the issue of perfecting a security interest. Matter of E.A. Fretz Co., 565 F.2d 366, 371 (5th Cir.1978). Further, ITT should not be penalized, as BOW implicitly suggests, for discovering more information about its debtor, beyond the search it requested from the Secretary.

## VI. CONCLUSION

It is often said that tough cases make bad law. That axiom is certainly applicable to this case. Innovations in software technology that could retrieve a hyphenated word, whether interpreted as one word or two, may eventually moot this decision. Indeed, the particular software may already be available. Nonetheless, such innovations will come too late for BOW.

---

4. Similarly, the financing statements listing the debtor's name as "Compucentro, USA" did not satisfy 9.402. They were also seriously misleading and, thus, did not perfect BOW's security interest.

5. The only instance where actual knowledge effects the validity of a financing statement under Article 9 is when the first secured creditor files its financing statement in good faith but in the wrong place or not in all the required places. TEX.BUS. & COM.CODE ANN. § 9.401(c) (Tex.UCC) (Vernon 1991); Morris, The Fruits of Mischievous Seeds at 271. Under these circumstances, if a subsequent secured creditor has actual knowledge of the contents of the erroneously filed financing statement, then the first secured creditor's financing statement is effective as against that subsequent secured creditor.

Each party in this case did what it thought was necessary to perfect its interests. Under different circumstances, BOW's financing statement could have been recovered by the search. Subsequent secured creditors, though, must be able to rely on the accuracy of search requests through the Secretary's filing system, regardless of the Secretary's capacity to recover financing statements which incorrectly list the name of the debtor.

In this situation, the party that has made the mistake must bear the burden of that mistake, harsh though it may be. The Court holds, therefore, that BOW's financing statements were seriously misleading as to the actual name of the debtor. BOW's security interest became unperfected four months after the debtor changed its name from "Carlos Chacon" to "Compu–Centro, USA, Inc." ITT, therefore, holds first position with regard to Compu–Centro, USA, Inc.'s collateral.

It is therefore ORDERED that ITT's Motion for Summary Judgment be GRANTED.

It is further ORDERED that BOW's Motion for Summary Judgment be DENIED.

It is further ORDERED that ITT provide a Form of Final Judgment to the Court on or before April 19, 1996, to include the calculation of post-judgment and pre-judgment interest as well as any restrictions as set out by the Interlocutory Judgment.

It is further ORDERED that ITT's request for reasonable and necessary attorney's fees and court costs be GRANTED. The Court will decide the issue on submission of briefs and affidavits by ITT on or before April 17, 1996, and submission of a response from BOW on or before April 26, 1996.